John R. RISING–MOORE, Plaintiff,

v.

**RED ROOF INNS, INC. Defendant.**

**No. 1:03CV0707SEBJPG.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 30, 2005.

Gary P. Price, Lewis & Kappes, P.C., Indianapolis, IN, for Plaintiff.

Harold Abrahamson, Abrahamson & Reed, Hammond.

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE EXPERT REPORT OF WILLIAM DICKINSON, P.E. UNDER DAUBERT AND RULE 702 F.R.E.

BARKER, District Judge.

This matter is before the Court on a Motion for Summary Judgment and a Motion to Strike the Report of William Dickinson, P.E., both of which motions were filed by Defendant, Red Roof Inns, Inc. For the reasons set forth in this entry, both motions are GRANTED.

### Factual Background

Late on the night of March 26, 2002, as Plaintiff, John R. Rising–Moore (hereinafter, "Rising–Moore"), began his long drive home to Spencer, Indiana from his office in the Broad Ripple area of Indianapolis, Indiana, a misty rain began to fall. The temperature was cold and weather reports predicted that conditions south of Indianapolis would get bad. Rising–Moore noticed that the moisture on his windshield wipers was beginning to freeze and thus he decided to spend the night at the Red Roof Inn in Speedway, Indiana, where he stays one to two nights per month, given the distance between his work and home. Rising–Moore arrived at the Red Roof Inn around midnight by which time the weather had begun to turn icy. Rising–Moore parked his truck in front of the motel entrance and entered using a ramp that leads up to the front door. In his deposition, Rising–Moore stated that he did not recall having any difficulty ascending the ramp, which is consistent with prior state-

ments he had made to Defendant's security guard and insurance representative that, at the time he entered the office, the ramp "wasn't real slick or anything." Rising–Moore remained inside the reception area of the motel for approximately fifteen to twenty minutes, according to his estimate, while he reserved a room.

Rising–Moore then exited the motel to return to his truck, whereupon he slipped and fell on the entryway ramp, hitting his head and incurring other injuries. The ramp is uncovered, with an incline of less than a foot between the parking lot and the sidewalk and measures six feet, eight inches in width and eight feet in length. Rising–Moore stated to Defendant's insurance representative that, after he regained consciousness, he noticed the "conditions had changed dramatically, and everything was just a sheet of ice." Rising–Moore reported that the ice had accumulated during the fifteen to twenty minutes he had been inside the main office of the motel. Robby Harris, a Red Roof Inn security guard and off-duty police officer who had been in the vicinity when Rising–Moore first entered the office, testified that Rising–Moore had been inside for only approximately five to ten minutes before exiting. After Rising–Moore fell, Harris came to his assistance, helping him to his feet and offering to take further steps to insure he received proper medical attention. Harris also retrieved from the motel office some ice melting salt and dispersed it along the sidewalks adjoining the property.

In his complaint, Rising–Moore alleges that he suffered serious and permanent injuries including, but not limited to, a closed head wound and related neurological impairment. He seeks compensation for medical bills, lost income, pain and suffering, and other losses, claiming that his injuries were proximately caused by Defendant Red Roof Inn's failure to exercise ordinary and reasonable care to protect its patrons from dangerous conditions about which it had knowledge, or should have had knowledge through the exercise of ordinary and reasonable care.

Defendant has filed this Motion for Summary Judgment. As part of his response to the Motion for Summary Judgment, Rising–Moore proffered an expert report from William Dickinson, P.E., which purports to establish that the ramp had latent physical characteristics which rendered it unreasonably dangerous when icy or wet. The "Dickinson Report" concludes that the ramp where Rising–Moore fell was too steep and that the presence of debris, such as ice, reduced its effective friction coefficient to a hazardous level, thereby creating a dangerous environment for pedestrians. Defendant has filed a Motion to Strike the Report of Mr. Dickinson.

### *Motion to Strike Dickinson Report*

Before we reach the merits of Defendant's dispositive motion, we must determine whether the "expert report" of William Dickinson, P.E., as tendered by Plaintiff, is admissible evidence. For the reasons explained below, we conclude that it is not.

■ In the seminal holding of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)[1], the United States Supreme Court established the now familiar rule (later enacted as F.R.E. 702) that requires the trial court, in passing on the admissibility of expert testimony, to deter-

---

1. Also see, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

mine its relevancy and reliability in the context of scientific evidence on the basis of: (1) whether the subject of the expert's testimony involves "scientific knowledge" and (2) whether the scientific knowledge will assist the trier of fact to understand and/or determine a fact in issue. In order to qualify as scientific knowledge, the expert opinion or conclusion must be derived from the scientific method. *Id.* The "scientific knowledge" prong of the *Daubert* analysis is intended to ensure the scientific reliability of the evidence. According to Supreme Court precedents, an expert's opinion must consist of more than "subjective belief or unsupported speculation." *Id.* at 589, 113 S.Ct. 2786. In applying *Daubert* standards, the Seventh Circuit has directed that a "district judge should assure (herself), before admitting expert testimony, that the expert knows whereof he speaks." *Bammerlin v. Navistar International Transp. Corp.*, 30 F.3d 898, 901 (7th Cir.1994). While recognizing that the "scientific knowledge" test is a flexible one, lower courts examine such factors as whether the method used to arrive at a particular conclusion has been tested, whether it has been subjected to peer review and publication, what the method's potential rate of error is, and whether the knowledge is "generally accepted." *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. The "Dickinson Report" advances essentially two conclusions: (1) Defendant's

ramp was unsafe because it was too steep and did not have handrails, and (2) Defendant's ramp was unsafe when icy or wet. We analyze the methodologies and reasoning behind each of these conclusions.[2]

### (1) *Ramp Too Steep and Lacking Handrails*

In concluding that the ramp at issue was too steep and should have had handrails, Dickinson drew upon standards adopted by the American National Standards Institute for making buildings and facilities accessible to handicapped individuals, ANSI A117.1. According to Dickinson, these standards have been adopted in the Indiana Uniform Building Code ("UBC"). Defendant claims that these standards are irrelevant because the ramp at issue was not part of the handicapped accessibility route for the motel.[3]

■ That the ramp at issue lacked handrails is undisputed. Neither does Defendant quarrel with the slope measurements taken by Dickinson indicating that the average slope of the ramp was 6.7 degrees. What Defendant does dispute is that it intended that ramp to serve as its handicapped access ramp, offering the affidavit of its own expert to explain that an adjacent compliant ramp on the property serves the purpose of providing handicapped accessibility and links up with the individual parking spaces in the parking

---

**2.** The expert report actually addressed two ramps: the ramp in front of the main entrance, referred to as the "south ramp," and the ramp to the left side of the main entrance, referred to as the "east ramp." The slope, width and depth of the ramps differ. The report references the south ramp as the ramp where Mr. Rising–Moore fell. In its reply brief, however, Defendant claims that the report is in error because the incident occurred on the east ramp. No citation to any part of the record in support of this assertion has been provided. Therefore, we give the benefit of the doubt to the expert report with respect

to the identity of the ramp at issue and assume the incident occurred on the south ramp.

**3.** Dickinson also refers to the national building code manual in support of the slope and handrail requirements for the ramp and the need for a slip resistant surface. In the context of this case, however, the manual is irrelevant both because its standards have not been adopted by the State of Indiana and because the standards referred to apply only to handicapped access ramps.

lot. This all seems beside the point, however, because Rising–Moore had parked his truck in front of the entrance, not even in a parking space, and was neither disabled nor confined to a wheelchair; in fact, he does not actually contend that the slope of the ramp contributed in any manner to his fall. In addition, Defendant's expert notes that there are standards in the UBC for ramps *not* intended to serve as access for handicapped patrons and that the ramp at issue complies with the slope requirements of that section. In short, the standards applied by Dickinson and his findings are irrelevant. Consequently, even if his report were scientifically reliable, it's admissibility would founder for lack of relevance. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786.

### (2) *Ramp Lacked Slip Resistance*

■ Dickinson's second expert conclusion is that Defendant's ramp was unsafe when icy or wet. He reaches this conclusion from tests he conducted two years after the incident at issue wherein he attempted to determine the effective friction coefficient between the surface of the ramp and samples of materials commonly used for the souls of shoes. Dickinson's tests, however, did not incorporate reliable scientific methodology and his conclusions are simply too speculative to be admitted to assist a trier of fact in understanding any fact at issue.

Dickinson first tested the friction coefficient between a leather sole and the dry surfaces of the ramps. Then he tested the friction coefficient between a Neolite ™ (rubber) sample and the dry surfaces of the ramps. Next, he sprayed the ramps with a mist of tap-water and retested the friction coefficient between the Neolite ™ sample and the ramps' surfaces. After calculating a 15% decrease in friction coefficients, he calculated a correlative reduction in the friction coefficient of the leather samples on the dry ramp surfaces and

concluded that the friction coefficient for the leather sample on the wet ramp surfaces was unsafe.

There are several obvious problems with Dickinson's methodology and conclusions. First, by Dickinson's own admission, "[t]here are no standards written to associate the safety of a walking surface with the results of coefficient of friction tests using a Neolite ™ sample...." Thus, Dickinson's conclusions are based on tests which have not been verified by the scientific community. Moreover, Dickinson makes no effort to demonstrate that his methodology has been subjected to peer review or publication, as also required by *Daubert*. Second, Dickinson has no basis for his application of the 15% decrease in friction coefficient from the Neolite ™ samples to the leather samples. There is no evidence that leather and Neolite ™ react similarly to changing conditions. The usefulness of this data is further reduced by Rising–Moore's testimony that he is unsure what type of soles were on the shoes he was wearing on the evening of his fall. Finally, no foundation has been laid for our assuming that the slip resistance of the ramp was the same in 2004 as it was in 2002, or that the pavement conditions were comparable (i.e., water versus ice). Dickinson's reasoning is marred by conspicuous "analytical gaps," which render his conclusions unreliable in the context of this case, certainly, and perhaps even more broadly. *Lytle v. Ford Motor Co.*, 696 N.E.2d 465, 472 (Ind.App.1998).

Because the "Dickinson Report" does not satisfy the scientific knowledge requirement of *Daubert*, the issue of whether the report would assist a trier of fact in understanding a fact at issue becomes moot. Even if viewed apart from the scientific knowledge requirement, however, Dickinson's conclusions would fail on this second prong of the *Daubert* analysis as

well. Dickinson calculated the friction coefficients for the wet ramp and determined that they came within a range he identified as "adequate." Dickinson's test involved spraying tap water on the ramps in non-freezing weather, which as we have previously noted contrasts markedly from the conditions described at the time of the incident regarding ice accumulation. His conclusion that a "significant amount" of ice, frost or snow would "likely" render the ramp dangerous is also of little help to a trier of fact without a further explanation of a "significant amount." Dickinson also failed to take into consideration any other related factors, such as the speed at which the soles of his samples (or Rising–Moore's shoes) made contact with the surface or the size/weight of the traversing party. In short, the Dickinson report raises more questions than it answers, providing virtually no assistance to a fact finder in terms of reaching an understanding of any potential danger associated with the ramp in terms of its physical condition at the time of the incident, under the extant weather conditions at the time, and in terms of the interaction of the materials forming the soles of Rising–Moore's shoes and the ramp. Experts' opinions as to probable cause need not rule out all other potential causes, *Mihailovich v. Laatsch*, 359 F.3d 892, 920 (7th Cir.2004) (referencing *Jahn v. Equine Services*, 233 F.3d 382, 390–92 (6th Cir.2000)), but Dickinson's vague, speculative and incomplete conclusions are not persuasive as to any cause they purport to advance as an explanation for the slip and fall by Rising–Moore.

We have engaged in the two-prong analysis of expert testimony called for by *Daubert*, and Rule 702, F.R.E., but our decision, in truth, is even more firmly grounded in considerations of relevance, an evidentiary concept more straight forward and time tested than a judicial exploration into how and when expert testimony is appropriate for consideration by the fact finder. Apart from the proffered witness's credentials, when test protocols do not incorporate the circumstances that lead up to Plaintiff's injury, they are of no relevance, and therefore no help in deciding whether or not liability for negligence should be imposed.

### Motion for Summary Judgment

We turn now to Defendant's Motion for Summary Judgment. Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Id.* at 255, 106 S.Ct. 2505.

### Analysis
### Nature of Claim & Duty Owed

 Plaintiff's claim sounds in negligence, which state law[4] tort consists of three elements: (1) a duty owed by Defendant to Plaintiff, (2) failure by Defendant to conform his conduct to the requisite standard of care dictated by the relationship (breach of duty), and (3) an injury

---

4. This case is before the Court pursuant to our diversity jurisdiction, about which there is no dispute between the parties.

suffered by Plaintiff as a result of Defendant's breach of duty. *Orth v. Smedley,* 177 Ind.App. 90, 378 N.E.2d 20, 22 (1978). The duty allegedly owed by a defendant to a plaintiff is a question of law. *Guy's Concrete, Inc. v. Crawford,* 793 N.E.2d 288, 293 (Ind.App.2003). Under Indiana law, a person's status when he is on the property of another dictates the level of duty owed that person by the landowner. *Markle v. Hacienda Mexican Restaurant,* 570 N.E.2d 969, 972 (Ind.App.1991). A person coming onto the premises of another is either a trespasser, a licensee or an invitee. *Burrell v. Meads,* 569 N.E.2d 637 (Ind.1991). Where business premises are involved, such as a motel which encourages patrons and customers to enter the premises for the benefit of the landowner, the landowner owes the highest of duties related to occupancy of the real estate. *Id.* at 639–40. Pursuant to Indiana common law, therefore, Defendant owed its customer, Rising–Moore, "a duty to exercise reasonable care for his protection while he is on the landowner's premises." *Id.*

■ Accordingly, a possessor of land is liable for personal injuries suffered by a business invitee as a result of a condition on the land, but only if the landowner:

 (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees; and

 (b) should expect that the invitees will not discover or realize the danger, or will fail to protect themselves against it; and

 (c) fails to exercise reasonable care to protect them against the danger.

*Id.* at 640.

Plaintiff's negligence claim proceeds on two separate fronts: First, Defendant breached its duty of care by providing a latently dangerous ramp; Second, Defendant breached its duty of care by failing to react to the icy weather conditions by promptly clearing the ramp of accumulating ice.

Without admissible expert testimony, Plaintiff's first claim is a non-starter. There simply is no evidence to establish that Defendant was negligent in providing a ramp which lacked handrails and incorporated too severe a degree of slope. Plaintiff concedes that such a defect is not readily apparent if, indeed, it is a defect. Plaintiff's evidence fails to prove that the ramp upon which Rising–Moore fell was unreasonably dangerous. Lacking any genuine issue of material fact with regard to the Defendant's exercise of reasonable care with respect to the "design" or physical make-up of the ramp, summary judgment is appropriate.

Concerning the issue of a duty to maintain the premises in a safe condition, while it is generally true that issues regarding the appropriate degree of care exercised by a landowner or one in control of the premises is a question of fact for resolution by a jury, where there is no evidence of negligence from which a reasonable jury could impute liability, summary judgment is available to the defendant. *See Orth v. Smedley,* 177 Ind.App. 90, 378 N.E.2d 20 (1978). In this case, Defendant asks us to conclude as a matter of law that no reasonable jury could find that it breached its duty of care by failing to undertake ice removal efforts during a five-to-twenty-minute time period during which Plaintiff was inside at Defendant's main reservations desk area, having entered the motel as ice was beginning to accumulate and having returned outdoors to re-enter his truck that he had left parked in an unprotected location, (from the elements), in front of the motel entrance.

Defendant relies on the *Orth* decision as authority for a determination in its favor. In *Orth,* the Indiana Court of Appeals

affirmed a trial court's summary judgment in favor of a defendant landlord who was sued by a tenant who fell because of an accumulation of ice which had formed overnight on the pathway from her apartment to the roadway. *Id.* at 21. In so ruling, the Court of Appeals cited a Rhode Island Supreme Court decision adopting what has come to be referred to as the "Connecticut rule," which rule allows a landlord "reasonable time after the storm has ceased to remove the accumulation of snow or ice found on the common ways" before he can be found liable for having failed to remove it. *Id.* at 23 (quoting from *Fuller v. Housing Authority of Providence,* 108 R.I. 770, 279 A.2d 438 (1971)). The Indiana court in *Orth* did not adopt the Connecticut rule, *per se,* but followed its reasoning, holding that neither the absent landlord nor his agent at the scene had sufficient opportunity so early in the morning to learn of the overnight ice accumulation and rid the common areas of that risk. *Id.* at 23–24.

Rising–Moore argues, on the other hand, that the holding in *Rossow v. Jones,* 404 N.E.2d 12 (Ind.App.1980), should apply here. In *Rossow,* plaintiff slipped and fell on the steps of an apartment house where he was staying. *Id.* at 13. The steps were covered with an accumulation of snow which had built up over a week's time. *Id.* at 14. The landlord had shoveled off the snow from the steps on previous occasions to the fall by plaintiff and had placed salt and shovels on the premises, but they were at the time of plaintiff's fall locked away and thus unavailable to anyone without a key. *Id.* Citing *Hammond v. Allegretti,* 262 Ind. 82, 311 N.E.2d 821 (1974), which suggests that the duty to keep premises safe for a business invitee countenances no exception for natural accumulations of snow or ice, the Court in *Rossow* affirmed the small claims court award of $2,500 to the plaintiff, reconciling in a footnote its decision with *Orth* by

noting that in *Orth* the landlord lacked a reasonable time to discover the condition of the pathway. *Id.* at 14 n. 1. Indeed, the concurring opinion in *Rossow* endorses the soundness of the "Connecticut rule." *Id.* at 16.

■ Invoking the logic of *Rossow,* Rising–Moore contends that Red Roof had a duty to take precautions to prevent him from slipping and falling on its icy ramp. We think, under the facts of this case, that such a decision would place a greater duty of care upon Defendant than the law actually requires, particularly if the principles of the Connecticut rule are applied here. Though *Rossow* did impose liability upon the landowner for its failure to remove ice and snow, the facts of that case are easily distinguishable from those in the case at bar. In *Rossow,* the landowner had allowed ice and snow to accumulate over a matter of several days; in contrast here, the time-frame was a matter of mere minutes and the weather situation was still developing, since Rising–Moore had had no reported difficulty entering the Red Roof premises from his parked vehicle. The case at bar is more closely analogous to the facts of *Orth,* in which the Indiana Court of Appeals found no liability as a matter of law. Here, Plaintiff alleges that he slipped and fell on ice that had accumulated over the course of as short a period of time as five minutes to as long as twenty minutes, and the record reflects that the first knowledge Defendant had of the icy or slippery conditions was when Rising–Moore fell. We credit this undisputed evidence because nothing has been adduced that contradicts it; we assume, for example, that late at night there may have been limited staffing at the motel, that perhaps only the desk clerk was on duty and that the clerk's attention as to the deteriorating conditions outside and ability to ameliorate them was consumed by her duties. What

the security guard's actual knowledge or responsibilities were prior to his post hoc remedies after Rising–Moore's fall is undeveloped in this record.

Plaintiff has been unable to establish through admissible evidence any actual or constructive notice of the icy condition of the ramp on the part of Defendant's agents, and we do not understand Indiana law to impose liability for Defendant's failure to *anticipate* poor weather conditions. Plaintiff's argument that Defendant should have taken precautions against bad weather, similar to when a city sends out its salt trucks on the roads before a snow storm develops, is not legally persuasive. Even where government has such a duty, before liability can attach the entity must have had an opportunity to correct injury-producing hazard and failed to do so. *Bree v. Harrison County,* 584 N.E.2d 1114 (Ind. App.1992). Because the evidence does not establish that Red Roof had knowledge of or opportunity to clear the ramp of ice during the short time Plaintiff was checking in for his overnight stay, it is not liable for Rising–Moore's subsequent injury from his fall as he left to re-enter his vehicle. Moreover, from all accounts, the person who had the most and best knowledge with regard to dangerous weather conditions was Plaintiff, himself, having heard the weather reports and experienced the initial icing-up of his windshield wipers. He, more than anyone else, should have known to be extra cautious when traversing the ramp; in any event, his knowledge was not imputable to Defendant.

### Conclusion

Because the "Dickinson Report" did not satisfy *Daubert* requirements that it be based upon sound scientific knowledge and practice and because its methodology lacked relevance which would undermine its value to a trier of fact in understanding fact(s) at issue, Defendant's Motion to Strike the "Dickinson Report" is GRANT-ED. In addition, no duty was imposed on Red Roof to know and ameliorate the risk associated with an accumulation of ice on its entrance ramp over the course of a five-to-twenty-minute time period so as to support a finding of negligence under the common law of Indiana as applied to premises liability, and Defendant did not breach its duty of care owed to Plaintiff. Summary Judgment in favor of Defendant on Plaintiff's claim of negligence is therefore appropriate.