**Sheila PERDUE, et al., Appellants–Plaintiffs,**

v.

**Anne Waltermann MURPHY, in her official capacity as Secretary of the Indiana Family and Social Services Administration, Pat Casanova, in her official capacity as Interim Director of the Office of Medicaid Policy and Planning, and Cathy Boggs, in her official capacity as Director of the Division of Family Resources, Appellees–Defendants.[1]**

No. 49A02–0901–CV–8.

Court of Appeals of Indiana.

Oct. 27, 2009.

<hr/>

1. The initially-named defendants of E. Mitchell Roob, Jeff Wells, and Zach Main, all of whom were sued in their official capacities, have since been succeeded by the above-named defendants who therefore serve as substituted parties pursuant to Indiana Appellate Rule 17(C).

Gavin M. Rose, Jacquelyn Bowie Suess, ACLU of Indiana, Indianapolis, IN, Attorneys for Appellants.

Gregory F. Zoeller, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BRADFORD, Judge.

In this interlocutory appeal we conclude that the plaintiffs' proposed Class B, which names all welfare applicants with disabilities in the State of Indiana who require reasonable accommodation and have been or will be denied benefits due to their alleged failure to cooperate with the FSSA on any number of grounds, is too broad to constitute a manageable class action under the Americans with Disabilities Act of 1990[2] ("ADA") and the Rehabilitation Act of 1973[3] ("RA"). We further conclude, however, that a more specific class could perhaps be defined. Accordingly, we affirm the trial court's denial of class certification for proposed Class B but remand for a hearing to determine whether a more specific class can be defined.

## FACTS AND PROCEDURAL HISTORY

### I. Operation of Welfare Programs in Indiana

The Indiana Family and Social Services Administration ("FSSA") is responsible for the operation of welfare programs in Indiana, including the Food Stamp, Medicaid, and Temporary Assistance for Needy Families ("TANF") programs. At some point in 2006 or 2007, FSSA contracted with private company IBM to provide many of these services.[4] This privatization of FSSA services, deemed "modernization," was to be phased in over several years. As of March 19, 2007, the State had transferred seventy percent of its workforce providing these services to IBM coalition member Affiliated Computer Services ("ACS"). As of May 19, 2008, approximately fifty-nine counties, including Madison County, had transitioned into this modernized system.

Prior to this privatization effort, every individual enrolled in a public benefits program had an assigned caseworker. The caseworker's responsibilities included conducting interviews for new applications, processing changes on each client's case, answering questions, and resolving problems, among other assigned duties. Clients could contact their caseworkers with questions. As a general matter, each caseworker had access to a hard copy of his client's file, and in some cases, the caseworker and client worked together for some time and formed a relationship.

---

2. 42 U.S.C. § 12101, *et seq.*

3. 29 U.S.C. § 701, *et seq.*

4. We recognize that this contract has recently been cancelled. The parties do not claim that this alters their appeal in the instant matter.

Under the modernized system, clients are not assigned individual caseworkers. Instead, applications for benefits are handled by service centers. Clients have electronic files rather than hard copy files, and no single service center employee is responsible for each client's file. In Grant County and in the proposed plan for Lake County, the service centers contain a call center and a document imaging center. Service centers function through specialized work groups which process issues relating to benefit recovery, address changes, Hoosier Healthwise and Medicaid applications, and spousal impoverishment. Clients may inquire about their cases either by phone or in person at the service centers. While it is mathematically possible, it is unlikely that a client calling about his or her case would speak to the same employee each time.

In applying or seeking recertification for benefits, an applicant or client must be deemed eligible. In order to determine eligibility under the modernized system, the computer system schedules an interview and sends notice of this interview to the client. If a client fails to appear for the scheduled interview, the client is sent a "notice of missed interview" after which Food Stamp benefits cease. With respect to Medicaid and TANF, a service center employee must enter a "reason code" demonstrating that the client failed to appear for the interview, which generates a notice of adverse action. If the client fails to reschedule within the designated time period, he or she is deemed ineligible for benefits.

Following the initial interview, the client is sent State Form 2032, which lists and specifies those documents which the interviewer finds necessary for purposes of establishing and verifying eligibility. Under the pre-modernization system, a client seeking assistance with the verifications required by Form 2032 could contact a caseworker, whose name and phone number were provided at the top of Form 2032. Form 2032, as revised for use under the modernized system, provides no such caseworker-specific information.

Upon denying or terminating benefits, an ACS employee assigns a code number specifying the basis of the client's ineligibility. Among the bases for terminating eligibility are failure to complete a personal interview and failure to cooperate in providing the necessary verifications regarding income or value of resources.

## II. Sheila Perdue

The following facts are alleged in Perdue's complaint. Perdue is an adult resident of Madison County. Perdue suffers from nerve damage in both of her ears, for which she has been prescribed hearing aids; arthritis in both of her hips; emphysema; routine migraine headaches; chronic obstructive pulmonary disease; severe depression; and bipolar disorder. Perdue has difficulty understanding her surroundings. She has difficulty hearing, seeing, reading, and comprehending what people tell her or what she receives in writing.

In December 2007, Perdue was enrolled in both the Food Stamp and Medicaid for the Disabled programs and had been for three or four years. In December 2007, Perdue received notice from the FSSA indicating that she was required to be certified for these programs and that she was required to participate in a telephonic interview. During this telephonic interview, Perdue had difficulty hearing what the interviewer was saying over the telephone. Perdue allegedly asked to schedule an in-person interview but was told she could not. Perdue understood from her interview that she was required to provide the FSSA with certain documents for purposes of demonstrating her eligibility for these programs. Perdue traveled to the

FSSA Help Center in Anderson and requested assistance in preparing the documents but was refused assistance. Perdue submitted certain documents in an attempt to comply with the FSSA's requirements.

In January of 2008, Perdue received a letter from the FSSA indicating that her application for Food Stamps had been denied. The stated reasons for this denial of eligibility were (1) Failure to Return a Signed Redetermination Form and (2) Receipt of or Increase in Unearned Income. In addition, this letter indicated that Perdue's Medicaid benefits would be discontinued for the stated reasons of (1) Failure to Cooperate in Establishing Eligibility and (2) Failure to Cooperate in Verifying Income. Perdue was unaware how she had failed to comply with FSSA documentation requirements. Perdue did not appeal her denial of benefits. At no time did an FSSA employee contact Perdue to assist her in completing the required documentation or explain which documents had not been received. Since February 29, 2008, Perdue has been assigned an authorized representative to assist her in applying to the Medicaid program. According to Perdue, this representative is not always available to assist her and frequently does not do so.

### III. Putative Class B

The plaintiffs point to statistical evidence demonstrating what they allege is an increase in denied benefits since December of 2007. This, coupled with statistical evidence regarding the numbers of disabled persons in the population, demonstrates, according to the plaintiffs, that the modernized system has a disparate impact on persons with disabilities.

The plaintiffs' evidence includes tables demonstrating that between January of 2006 and May of 2008, approximately 383,-000 individuals were terminated or denied benefits from the Food Stamp, Medicaid, and TANF programs due to their failure to cooperate with certain FSSA requirements. In some cases, the number of individuals denied benefits greatly increased between December 2007 and April 2008. Specifically, individuals denied Medicaid due to "failure to cooperate in establishing eligibility" almost quadrupled between December 2007 and April 2008. The number of individuals denied Food Stamp benefits due to "failure to complete a personal interview" or "failure to cooperate in establishing eligibility" increased by thirty-five percent and twenty-nine percent, respectively, between December 2007 and May 2008.[5] In other categories, however, the increase in denied benefits was much less, including the seven percent increase in denials of TANF benefits between December 2007 and May 2008 due to "failure to cooperate in establishing eligibility." According to the plaintiffs, an average of approximately 18,000 individuals were denied or lost benefits from January through May of 2008 due to an alleged "failure to cooperate."[6] In 2007, in contrast, the average number of individuals denied benefits each month was approximately 13,500. In 2006, the average number was 10,900.

The plaintiffs additionally reference data from the United States Census Bureau in

---

5. The Appellants claim these numbers, which went from 1078 to 1458 (failure to complete a personal interview) and from 3178 to 4100 (failure to cooperate in establishing eligibility) "rose almost 150%." Appellant's Br. p. 16. While 1458 is approximately 135 percent of 1078 and 4100 is approximately 129 percent of 3178, the greater numbers cannot be said to have *increased* by these percentages over the lesser numbers.

6. "Failure to cooperate" refers generally to any of the FSSA's reasons for denying benefits.

arguing that of the approximately 3.5 million individuals in Indiana between the ages of sixteen and sixty-four, 1.2 million had disabilities.[7] Of these, approximately 144,000 (4.1 percent of the population) had mental disabilities, 63,617 (1.8 percent of the population) had self-care disabilities, and 97,400 (2.8 percent of the population) had sensory disabilities.

In the instant lawsuit, Perdue sought to represent a class of persons injured by the FSSA's failure to reasonably accommodate their disabilities and its accompanying denial of benefits due to their alleged failure to cooperate. The class, named Putative Class B, is defined as follows:

> Any and all individuals, families, and/or households in Indiana who, by reason of their disability and/or disabilities, require or will require reasonable accommodation in applying for, recertifying, or maintaining their eligibility for benefits under the Medicaid program, the Food Stamp program, and/or the TANF program, and who are denied from or will be denied from, or have been terminated from or will be terminated from the Medicaid program, the Food Stamp program, and/or the TANF program because the defendants have determined or will determine that the individual, family, and/or household should be denied from and/or terminated from the aforementioned program(s) for any of the following reasons: failure to cooperate in establishing eligibility, failure to cooperate in verifying income, failure to cooperate in verifying the value of re-

sources, failure to verify Indiana residency, failure to complete a personal interview required to establish eligibility, failure to cooperate in verifying assistance group composition, failure to return a signed redetermination form, failure to submit medical information necessary to establish eligibility, and/or failure to submit visual information necessary to establish blindness.

Appellant's App. pp. 16–17.[8]

On March 26, 2008, certain plaintiffs who had been denied or faced denial of benefits filed a class action complaint against the defendants seeking declaratory and injunctive relief and certification of certain classes. On May 16, 2008, the plaintiffs filed an amended complaint adding Perdue as a named plaintiff, making claims under the ADA and the RA, and seeking certification of one class and three sub-classes. Following the plaintiffs' August 5, 2008 amended motion seeking class certification of three classes and one subclass, the parties stipulated to the certification of two classes and one subclass (Classes A and C, and Subclass A), which the trial court approved on January 9, 2009.[9] The parties disputed whether Class B qualified for certification. On November 19, 2008, the trial court entered findings and conclusions denying certification of Class B. Following the plaintiffs' unsuccessful renewed motion for certification of Class B, on February 18, 2009, this court granted the plaintiffs' motion to accept their interlocutory appeal of the order.

---

**7.** Perdue's statistics suggest that there are approximately 3.9 million individuals, not 3.5 million, between ages sixteen and sixty-four.

**8.** Both parties agree that proposed Class B has undergone certain amendments. This is its amended version which was denied certification.

**9.** Perdue is a representative member of Class A and Subclass A. Class A is defined by those

who are denied benefits from Medicaid, Food Stamps, and/or TANF due to certain enumerated reasons. Subclass A is defined by those who are denied benefits from Medicaid. Class C, for which Perdue is not a representative member, is defined by those who are denied benefits from the Food Stamp program.

## DISCUSSION AND DECISION[10]

### I. Standard of Review

 Generally, a trial court's denial of class certification is reviewed for an abuse of discretion. *Lemon v. Wishard Health Servs.*, 902 N.E.2d 297, 299 (Ind.Ct.App. 2009), *trans. denied.* If substantial evidence supports the trial court's exercise of discretion, we will affirm. *Id.* (citing *Associated Med. Networks, Ltd. v. Lewis*, 824 N.E.2d 679, 682 (Ind.2005)). We may affirm on any legal theory supported by the evidence. *Id.* at 299–300. A misinterpretation of law, however, will not justify affirmance under the abuse of discretion standard. *Lewis*, 824 N.E.2d at 682.

 In this case, the trial court entered specific findings of fact and conclusions thereon without being required to do so. When the trial court enters such findings, the specific findings control only as to the issues they cover, and a general judgment standard applies to any issues upon which the court has not found. *Wal–Mart Stores, Inc. v. Bailey*, 808 N.E.2d 1198, 1201 (Ind.Ct.App.2004), *trans. denied; see* Ind. Trial Rule 52(D). We employ a two-tiered standard of review when reviewing specific findings. *Id.* We first determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* In deference to the trial court's proximity to the issues, we will reverse a judgment only when it is shown to be clearly erroneous. *Id.* A judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions entered on the findings. *Id.* Although we defer substantially to the trial court's findings of fact, we do not do so as to the conclusions of law. *Id.* We evaluate questions of law de novo. *Id.*

### II. Applicable Law

Indiana Trial Rule 23 governs class actions. The party requesting class certification must prove that the proposed class meets all of the requirements of Indiana Trial Rule 23(A) and at least one of the requirements of Trial Rule 23(B). *Id.* (citing *Independence Hill Conservancy Dist. v. Sterley*, 666 N.E.2d 978, 981 (Ind.Ct. App.1996)).

Trial Rule 23(A) provides that a plaintiff may sue as a representative on behalf of a class if the following four requirements are met:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Trial Rule 23(B) lists the following three additional prerequisites, any one of which may be used to support a class certification:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of:

(a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interest of the other members not

---

**10.** We held oral argument in this case on September 29, 2009, and wish to thank counsel for their fine advocacy.

parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(d) the difficulties likely to be encountered in the management of a class action.

▬▬▬ In considering the parties' arguments relating to Trial Rule 23, it is appropriate to look to federal courts' interpretation of Federal Rule 23, which serves as the basis for our own rule. *In re Tina T.*, 579 N.E.2d 48, 55 (Ind.1991). A review of both federal and Indiana law suggests that in addition to the express requirements for class certification, there is an implicit "definiteness" requirement. *Sterley*, 666 N.E.2d at 981 (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir.1977)). Because a judgment in a class action has a res judicata effect on absent class members, a properly defined

class is necessary at the outset. *Id.; see Alliance*, 565 F.2d at 977 n. 6. A class definition must be specific enough for the court to determine whether or not an individual is a class member. *Sterley*, 666 N.E.2d at 981. Without a properly defined class, a class action cannot be maintained. *Id.* at 982.

### III. Allegedly Erroneous Legal Conclusions

In challenging the trial court's denial of class certification, the plaintiffs claim that it reached several erroneous legal conclusions, among them that (1) the class failed to satisfy the implicit "definiteness" requirement for class actions; (2) the class lacked commonality because there was no possible common nucleus of operative fact applicable to the entire class; (3) Perdue's claims could hardly be typical of an entire class of alleged disabled persons; (4) Perdue could not fairly and adequately protect the interests of the class; and (5) the plaintiffs had failed to show any common course of conduct concerning individuals with disabilities as required by Trial Rule 23(B)(2). According to the plaintiffs, these conclusions are legally erroneous on three grounds: (1) they analyze "definiteness" according to whether every single current and future class member is immediately identifiable, which is more applicable under Rule 23(B)(3) rather than under Rule 23(B)(2), the ground upon which certification was sought; (2) they are unpersuasive with respect to the plaintiffs' "disparate impact" claim, which is inherently class-based; and (3) they suggest that certification of classes of disabled persons is never proper under the ADA and RA, which is contrary to case law.

### A. "Definiteness"

In denying certification, the trial court characterized the instant action as a series

of individual ADA/RA actions which would require mini-trials and individualized inquiries before class membership could even be established. On this ground, the trial court concluded that the class lacked definiteness. In arguing that the trial court improperly applied the "definiteness" standard, the plaintiffs argue that the "definiteness" standard for class certification under Rule 23(B)(2), as opposed to Rule 23(B)(3), does not require that each class member be specifically identified at the outset of the litigation.

### 1. Rule 23(B)(2)

Rule 23(B)(3) focuses upon the parties' common questions of law or fact, suggesting that "definiteness" under this rule requires more immediate ascertainment of the class members. Rule 23(B)(2), in contrast, which addresses claims for declaratory and injunctive relief, is defined more by the defendants' actions against a group as a whole than the plaintiffs' individual identities. Authority suggests that Rule 23(B)(2) was specifically drafted to facilitate relief in civil rights suits and that it is proper for a class to be defined generally, even amorphously, in actions, like the instant one, seeking declaratory or injunctive relief. *See* A. Conte and H. Newberg, Newberg on Class Actions, §§ 6.15, 25.20 (4th ed.2002).

Plaintiffs point to cases endorsing this looser "definiteness" standard in circumstances—such as those at issue here—where the plaintiffs are seeking declaratory and injunctive relief pursuant to Federal Rule of Civil Procedure ("FRCP") 23(b)(2). *Midwest Community Council, Inc. v. Chicago Park District,* 87 F.R.D. 457, 459 (N.D.Ill.1980), involved a civil rights action brought by certain named plaintiffs, on behalf of the residents of certain Chicago wards, who sought declaratory and injunctive relief against the parks district for its alleged failure to pro-

vide equal recreational programs and facilities in areas populated predominantly by black citizens. In rejecting the defendants' objection to certification of the class, the district court observed that where the "defendants' alleged policies and practices shape the contours of the class, attacks on its definiteness are not entitled to weighty consideration provided all other requirements for class certification are established." *Id.* at 460.

Similarly, in *Yaffe v. Powers,* 454 F.2d 1362, 1366 (1st Cir.1972), which involved a class action seeking declaratory and injunctive relief against a police chief for surreptitious police photography and surveillance, the First Circuit found that the district court had erred in determining that class members had not been sufficiently identified. In reaching this conclusion, the First Circuit stated as follows in observing that the court had erroneously applied the standards applicable to FRCP 23(b)(3) rather than 23(b)(2):

> Although notice to and therefore precise definition of the members of the suggested class are important to certification of a subdivision (b)(3) class, notice to the members of a(b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited. In fact, the conduct complained of is the benchmark for determining whether a subdivision (b)(2) class exists, making it uniquely suited to civil rights actions in which the members of the class are often " 'incapable of specific enumeration.' "

*Id.* (quoting Committee's Notes to Revised Rule 23, 3B Moore's Federal Practice ¶ 23.01 [10–2] (2d ed.1969)).

### 2. Rule 23(B)(2) and the ADA

There is little dispute that Rule 23(B)(2) permits a more relaxed interpretation of the implicit "definiteness" requirement for

class actions. Even so, the plaintiffs point to no authority suggesting that this requirement, in the ADA/RA context, is relaxed enough to permit class actions when the only unifying criteria for the members of the class are that they are somehow disabled, in need of accommodation, and mutually affected by the policy sought to be enjoined.

### a. The *Hohider* Analysis

Indeed, authority suggests to the contrary. In *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 200 (3d Cir.2009), the Third Circuit [11] reversed a District Court's decision granting certification of an ADA class action, holding that the individualized inquiries necessary to determine ADA eligibility rendered class certification improper, even if plaintiffs were solely seeking injunctive and declaratory relief pursuant to FRCP 23(b)(2).

The plaintiffs in *Hohider* were a nationwide class of employees, consisting of perhaps 36,290 members, who had taken leave for various medical reasons and sought unsuccessfully to return to work with medical restrictions. 574 F.3d at 172–73. The plaintiffs' ADA claims alleged that the defendant had a companywide policy refusing accommodations for returning employees, effectively precluding them from resuming employment in any capacity due to their impairment. *Id.* at 172. In granting the plaintiffs class certification, the District Court had recognized that the inquiries necessary to determine whether the plaintiffs were "qualified individuals with disabilities" under the ADA [12] were too individualized for class evaluation, but that this did not preclude class certification because the alleged unlawful discrimination by the defendant could be considered separate and apart from the plaintiffs' "qualification" under the ADA.[13] *See id.* at 176–78.

In reversing the District Court's grant of class certification under FRCP 23(a) and (b)(2), the *Hohider* court concluded that it was not possible to reach a class-wide determination of unlawful discrimination under the ADA without analyzing whether the plaintiffs were "qualified." *Id.* at 176–77. Importantly, as the *Hohider* court observed, the ADA does not prohibit discrimination against "any" individual with a disability but rather only against "qualified" individuals with disabilities. *Id.* at 191. Because the ADA incorporated into its definition of prohibited discrimination an inquiry into whether the plaintiff was "qualified," evaluation of whether a disabled individual was "qualified" was necessary not only to determine

11. The Honorable Sandra Day O'Connor, *Associate Justice (Ret.)* of the Supreme Court of the United States, who sat by designation, was a member of the panel in this case. *Hohider*, 574 F.3d at 171.

12. Title I of the ADA provides, as a general rule, that "[n]o covered entity shall discriminate against a *qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Hohider*, 574 F.3d at 186 (citing 42 U.S.C. § 12112(a) (emphasis supplied)). A "qualified individual with a disability" is defined as "an indi-

vidual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* (citing 42 U.S.C. § 12111(8)).

13. The District Court applied the two-stage "*Teamsters* framework" method of proof, which involves separate liability and remedial stages, promulgated by the Supreme Court for adjudicating pattern-or-practice claims brought under Title VII of the Civil Rights Act of 1964. *See Hohider*, 574 F.3d at 176 (citing *Int'l. Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

whether discrimination on the basis of disability had occurred, but more fundamentally, whether such discrimination against that individual was unlawful and could sustain a claim. *See id.* at 191–92.

In *Hohider*, this evaluation regarding whether the plaintiffs were "qualified" required inquiries which were too individualized to permit classwide evaluation. Indeed, the proposed nationwide class in *Hohider*

> contain[ed] no unifying or limiting criteria—with respect to employment positions held or desired, for instance, or conditions suffered, or accommodations sought—that potentially would permit classwide evaluation of whether each member of the class is "qualified" and thus can perform the essential functions of a given job with or without reasonable accommodation.

*Id.* at 189.

In light of the individualized factual analysis required to determine whether each plaintiff was "qualified" and thereby alleging the *unlawful* discrimination necessary to sustain an ADA claim, the *Hohider* court denied class certification, concluding that the necessary inquiries were too individualized and divergent to warrant class certification under FRCP 23(a) and (b)(2). *Id.* at 185–86.

### b. Proposed Class B

In the instant case, the plaintiffs base their ADA action upon the FSSA's facially neutral policy, which they claim has a disparate impact upon persons with disabilities. Like in *Hohider*, the plaintiffs constitute a large group, estimated to include "thousands, if not tens of thousands, of individuals." Appellant's Br. p. 36. The class members allege only the general facts that they are disabled and require reasonable accommodation. Although in challenging the FSSA's policy, the plaintiffs perhaps seek the common accommodation of assigned caseworkers, this is not evident from the current definition of proposed Class B. Indeed, Class B as it is currently defined names no unifying or limiting conditions suffered or accommodations/modifications sought to permit classwide evaluation of whether they are "qualified" under the ADA such that discrimination against them on the basis of their disabilities is unlawful.[14] Without such limiting conditions, we conclude, pursuant to *Hohider*, that the necessary inquiries to establish the alleged discrimination in the instant case are too individualized and divergent to warrant certification.

To the extent the plaintiffs suggest that their common subjection to and effort to enjoin the same FSSA policy is an ade-

---

**14.** Under 42 U.S.C. § 12132, which is the applicable ADA provision under which plaintiffs bring their claim, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essen-

tial eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *See* 42 U.S.C. § 12131(2).

The parties agree that the RA analysis, which similarly prohibits discrimination against an "otherwise qualified individual with a disability" does not differ from the ADA analysis. *See* 29 U.S.C. § 794(a). Indeed, the language of the ADA generally tracks the language of the RA, and jurisprudence interpreting either statute generally applies to both statutes. *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir.2000).

quate unifier permitting class certification under Rule 23(B)(2), this is essentially the same argument which the *Hohider* court rejected, namely that a defendant's liability under the ADA can be determined irrespective of the plaintiffs' "qualification" under the statute. In fact, under *Hohider*, the two are inextricably linked: a class-wide determination of the defendant's liability necessarily involves an analysis of the plaintiffs' "qualification." *See id.* at 176–77. Indeed, even policies that are deemed per se discriminatory cannot give rise to a finding of liability and relief under the ADA without the statutorily required inquiry into whether those affected by the policy are qualified individuals with disabilities. *See id.* at 195. The existence of a uniform policy, therefore, does not serve to circumvent the "qualification" requirement. Having found no discernible limiting criteria for proposed Class B, we conclude, pursuant to *Hohider*, that the unlawful discrimination alleged by the plaintiffs in the instant case requires an assessment too individualized and divergent to warrant class certification under Rule 23(B)(2).[15]

## B. Disparate Impact

The plaintiffs attach special significance to the fact that they are bringing a disparate impact claim, arguing that such claims are uniquely suited to class actions. *See, e.g., Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir.2004) ("Generally disparate impact analysis is used in a class action. . . .") In support, the plaintiffs list numerous cases involving class certification of disparate impact claims brought under Title VII of the Civil Rights Act of 1964.[16]

▮ In the ADA context, both disparate-treatment and disparate-impact claims are cognizable. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003). The Supreme Court has consistently recognized a distinction between these claims. *Id.* at 52, 124 S.Ct. 513, 157 L.Ed.2d 357. Disparate treatment, the most easily understood form of discrimination, involves less favorable treatment of certain persons based upon the protected characteristic of, in this case, their disability. *See id.* Disparate impact claims, by contrast, involve practices or policies which are facially neutral in their treatment but that fall more harshly upon a certain group, in this case, individuals with disabilities. *See id.*

*Hohider* involved allegations of intentional discrimination and therefore was based upon disparate-treatment claims. The instant case involves challenges to the impact of the FSSA's facially neutral policy and is therefore based upon a disparate-impact claim. Regardless of whether, as the plaintiffs contend, disparate-impact claims are generally suited to class actions, this overall suitability does not overcome the problem identified in *Hohider* that unlawful discrimination under the ADA cannot be established without evaluating the persons alleging it. Indeed, regardless of whether the plaintiffs pursue a theory of

---

**15.** Even outside of the *Hohider* analysis, the plaintiffs' broad class is likely too indefinite to support certification. *See Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir.1980) (affirming denial of certification of class composed of all learning-disabled children in the State of Indiana on basis that class was "so highly diverse and so difficult to identify that it [was] not adequately defined or nearly ascertainable").

**16.** *See McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 271–72 (5th Cir.2008); *NAACP v. North Hudson Reg'l Fire & Rescue*, 255 F.R.D. 374, 380–85 (D.N.J.2009); *Anderson v. Boeing Co.*, 222 F.R.D. 521, 530–42 (N.D.Okla.2004); *Dean v. Int'l Truck & Engine Corp.*, 220 F.R.D. 319, 320–22 (N.D.Ill.2004).

disparate treatment or disparate impact, they must preliminarily establish that the alleged discrimination is unlawful. As in *Hohider*, in the instant case this requires determining whether the plaintiffs are "qualified," which is too individualized an analysis in this broad class to support a class action.

### C. If Not Here, Where?

The plaintiffs argue that the trial court's ruling effectively suggests that no class of persons pursuing an ADA/RA claim could ever sustain a class action under these statutes. In light of *Hohider*, this may be so in cases where, like the instant one, the class is defined so broadly that all persons with any disabilities, regardless of requested accommodations or modifications, are included. *See id.* at 186; *see also Burkett v. U.S. Postal Serv.*, 175 F.R.D. 220, 223–24 (N.D.W.Va.1997) (observing, in declining to certify class of persons with varying medical conditions, that "[i]n the view of several federal courts, the need for this individualized, fact-driven determination renders [RA] and ADA actions ill-suited for class treatment."). Nevertheless, as the plaintiffs point out, ADA/RA class actions are not infrequently certified. *See, e.g., Bates v. United Parcel Serv.*, 204 F.R.D. 440 (N.D.Cal.2001) (certifying class of plaintiffs with hearing disabilities); *Wilson v. Pa. State Police Dep't.*, No. Civ. A. 94–CV–6547, 1995 WL 422750 (E.D.Pa. July 17, 1995) (certifying class of plaintiffs with visual impairments); *Kimble v. Hayes*, Civ. A. No. 89–2644, 1990 WL

20208 (E.D.Pa.1990) (certifying class of candidates for police officer denied employment due to their vision problems).[17] In such cases, however, there appear to be some unifying criteria, such as a common disability or requested accommodation, for example, so that classwide evaluation of "qualification" may be conducted without requiring a prohibitive number of individual mini-trials.[18] *See Hohider*, 574 F.3d at 189 (suggesting that unifying criteria might include common conditions suffered or accommodations sought).

■ As it now stands, proposed Class B is too broad. But we are unable to conclude, and the defendants do not dispute, that a more limited class of persons challenging the FSSA's policy under the ADA may perhaps be defined and would be appropriate for class certification in the instant action. A class action cannot be maintained without a properly defined class, but a court can redefine the class in order to sustain the lawsuit. *See Sterley*, 666 N.E.2d at 982 (citing Ind. T.R. 23(C)(1) (providing that a court order regarding the permissibility of a class action may be conditional, and it may be altered and amended before a decision on the merit s)); *see also Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 397 n. 2 (N.D.Ill. 1987) ("It is unquestioned, of course, that the court has the discretion to redefine a class under appropriate circumstances to bring the action within Rule 23."). Accordingly, we remand to the trial court for a hearing to determine whether a more

---

**17.** Federal Rules of Appellate Procedure permit citation to unpublished opinions issued after January 1, 2007. *See* FRAP 32.1(a). The Rules are silent regarding unpublished opinions issued prior to that date. While the Indiana Rules of Appellate Procedure prohibit citation to memorandum decisions issued by this court, they do not prohibit citation to unpublished opinions issued by federal courts.

**18.** To the extent that *Hendricks–Robinson v. Excel Corp.*, 164 F.R.D. 667 (C.D.Ill.1996), which permitted class certification of all employees in a particular plant who were placed on medical layoff under the same policy, stands for the proposition that adverse treatment under the same policy adequately unifies class members for purposes of sustaining a class, we conclude it is inconsistent with *Hohider* and do not follow its holding.

specific class to sustain the instant ADA action can be defined.

### IV. Conclusion

Having concluded that proposed Class B is too broad to sustain an action under Rule 23(B)(2), we find it unnecessary to consider the parties' arguments relating to the mandatory class certification criteria under Rule 23(A).

The judgment of the trial court is affirmed, and the matter is remanded with instructions.

CRONE, J., and BROWN, J., concur.