**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 24 2013, 5:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KAREN CELESTINO-HORSEMAN**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**CAMERON G. STARNES**
**JESSICA ALLEN**
Office of Corporation Counsel
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JOHN AIKMAN,                              )
                                          )
    Appellant-Defendant,                 )
                                          )
        vs.                            )      No. 49A04-1209-OV-470
                                          )
CITY OF INDIANAPOLIS,                     )
                                          )
    Appellee-Plaintiff.                  )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Certo, Judge
Cause Nos. 49F12-1205-OV-19672, 49F12-1206-OV-22654

**September 24, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

On May 11, 2012, the Animal Care and Control Division of the Department of Public Safety of the City of Indianapolis ("ACC") impounded thirty-three dogs belonging to Appellant-Defendant John Aikman. Upon impounding the dogs, ACC alleged that Aikman had committed numerous violations of Chapter 531 of the Revised Code of the Consolidated City and County Indianapolis/Marion, Indiana ("Revised Code"). The alleged violations included the failure to maintain proper identification of all of the dogs, the failure to immunize all dogs over the age of three months against rabies, the failure to affix a tag indicating that a dog has received the required rabies vaccination to the dog's collar, and the failure to provide the dogs with a clean, sanitary, and healthy living environment. The dogs were subsequently released to Aikman on May 22, 2012. On May 30, 2012, ACC impounded fifty-one dogs and puppies belonging to Aikman. Upon impounding the dogs, ACC again alleged that Aikman had committed numerous violations of Chapter 531 of the Revised Code.

On August 17, 2012, following three days of trial, the trial court found that Aikman had committed numerous violations of Chapter 531 of the Revised Code in relation to the events of May 11, 2012, and May 30, 2012. The trial court also entered a permanent injunction which barred Aikman from owning or caring for any animal in Marion County. Aikman appealed. On appeal, Aikman raises numerous claims that we restate as: (1) whether the trial court erred in denying his request for a continuance, (2) whether the trial court abused its discretion in admitting certain evidence at trial, (3) whether the evidence was

sufficient to sustain the trial court's determination that Aikman committed numerous violations of Chapter 531 of the Revised Code, and (4) whether Aikman received sufficient notification of the Appellee-Plaintiff City of Indianapolis's ("City") intention to seek a permanent injunction. We affirm.

## FACTS AND PROCEDURAL HISTORY

On May 11, 2012, Sergeant Jason Kindig of ACC inspected animals owed or kept by Aikman in response to a call from a Greenfield, Indiana animal control officer. Sergeant Kindig observed thirty-three dogs in one parked vehicle that Aikman had driven from Greenfield to Marion County, Indiana with the dogs in the vehicle. Sergeant Kindig issued numerous citations alleging violations of Chapter 531 of the Revised Code, including twenty-six alleged violations of Revised Code section 531-202 (the failure to maintain proper identification of all of the dogs), twenty-six alleged violations of Revised Code section 531-301 (the failure to immunize all dogs over the age of three months against rabies), twenty-six alleged violations of Revised Code section 531-302 (the failure to affix a tag indicating that a dog has received the required rabies vaccination to the dog's collar), and thirty-three alleged violations of Revised Code section 531-401 (the failure to provide the dogs with a clean, sanitary, and healthy living environment). ACC impounded the thirty-three dogs. After a hearing on May 22, 2012, the trial court ordered that the dogs be released to Aikman and set the matter for a trial on the alleged citations.

On May 30, 2012, Officer Kimberly Wolsiffer of ACC responded to an anonymous report of care and treatment violations at Aikman's residence. Officer Wolsiffer was able to

3

observe the backyard of the house. However, Aikman would not give consent for Officer Wolsiffer to search the inside of his residence. Officer Wolsiffer applied for and received an administrative warrant to search inside the home. During her search of Aikman's residence, Officer Wolsiffer smelled a strong smell of urine and observed that the conditions of the home were very poor. Officer Wolsiffer observed feces and urine stains on the floor coverings in addition to piles of feces and puddles of urine on the floor. Officer Wolsiffer found that Aikman had fifty-one dogs and puppies in the residence. Officer Wolsiffer issued numerous citations alleging violations of Chapter 531 of the Revised Code, including thirteen alleged violations of Revised Code section 531-202 (the failure to maintain proper identification of all of the dogs), twenty-nine alleged violations of Revised Code section 531-301 (the failure to immunize all dogs over the age of three months against rabies), twenty-nine alleged violations of Revised Code section 531-302 (the failure to affix a tag indicating that a dog has received the required rabies vaccination to the dog's collar), and fifty-one alleged violations of Revised Code section 531-401 (the failure to provide the dogs with a clean, sanitary, and healthy living environment). ACC impounded the fifty-one dogs. After a hearing on June 6, 2012, the trial court set the matter for a trial on the alleged citations and ordered that the dogs be held until the conclusion of trial.

The trial was conducted over the course of three days. On June 22, 2012, the first day of trial, the City conducted its examination of Aikman. After the first day of trial, Aikman and his trial counsel suffered a breakdown of the attorney-client relationship. On June 29, 2012, counsel filed a motion to withdraw her appearance as Aikman's counsel. In her

4

motion, counsel indicated that Aikman was aware of her desire to withdraw her appearance.

On July 2, 2012, prior to the second day of trial, the trial court granted counsel's motion to withdraw her appearance. Aikman then requested a continuance. This request was denied. Trial continued with the City presenting the rest of its witnesses. Aikman represented himself during the proceedings conducted on July 2, 2012, engaging in cross-examination of the City's witnesses.

On August 17, 2013, the third day of trial, Aikman, again appearing *pro se*, presented his case. Aikman called witnesses and examined these witnesses. At the conclusion of the evidence, the trial court found that with respect to the events that occurred on May 11, 2012, Aikman committed twenty-six violations of Revised Code section 531-202, eleven violations of Revised Code section 531-301, and twenty-six violations of Revised Code section 531-302. With respect to the events that occurred on May 30, 2012, the trial court found that Aikman committed thirteen violations of Revised Code section 531-202, fourteen violations of Revised Code section 531-301, twenty-nine violations of Revised Code section 531-302, and fifty-one violations of Revised Code section 531-401. The trial court also issued an order permanently enjoining Aikman from owning or caring for animals in Marion County. This appeal follows.

## DISCUSSION AND DECISION

### I. Denial of Aikman's Request for a Continuance

Aikman contends that the trial court abused its discretion in denying his request for a continuance following the trial court's decision to allow Aikman's counsel to withdraw her

appearance on the second morning of trial.

> The decision to grant or deny a continuance is within the sound discretion of the trial court, and we will not reverse that decision unless the trial court has abused its discretion. *Homehealth, Inc. v. Heritage Mut. Ins. Co.,* 662 N.E.2d 195, 198 (Ind. Ct. App. 1996), *trans. denied.* A trial court abuses its discretion when it reaches a conclusion which is clearly against the logic and effect of the facts or the reasonable and probable deductions which may be drawn therefrom. *Id.* If good cause is shown for granting the motion, denial of a continuance will be deemed to be an abuse of discretion. *Koors v. Great Southwest Fire Ins. Co.*, 530 N.E.2d 780, 783 (Ind. Ct. App. 1988)[,] [(*abrogated on other grounds by Martin v. Amoco Oil Co.*, 679 N.E.2d 139, 144 (Ind. Ct. App. 1997)]; *see* Ind. Trial Rule 53.5.
> The unexpected and untimely withdrawal of counsel does not necessarily entitle a party to a continuance. *Koors*, 530 N.E.2d at 783. However, the denial of a continuance based on the withdrawal of counsel may be error when the moving party is free from fault and his rights are likely to be prejudiced by the denial. *Id.*
> Further, among the things to be considered on appeal from the denial of a motion for continuance, we must consider whether the denial of a continuance resulted in the deprivation of counsel at a crucial stage in the proceedings. *See Homehealth, Inc.*, 662 N.E.2d at 198. We must also consider whether a delay would have prejudiced the opposing party to an extent sufficient to justify denial of the continuance. *Id.*

*Hess v. Hess*, 679 N.E.2d 153, 154 (Ind. Ct. App. 1997) (brackets added).

The Marion County local rule regarding the withdrawal of an attorney's appearance

states as follows:

> All withdrawals of appearances shall be in writing and by leave of Court. Permission to withdraw shall be given only after the withdrawing attorney has given his client ten days written notice of his intention to withdraw, has filed a copy of such with the Court; and has provided the Court with the party's last known address; or upon a simultaneous entering of appearance by new counsel for said client. The letter of withdrawal shall explain to the client that failure to secure new counsel may result in dismissal of the client's case or a default judgment may be entered against him, whichever is appropriate, and other pertinent information such as trial setting date or any other hearing date. The Court will not grant a request for withdrawal of appearance unless the same has been filed with the Court at least ten days prior to trial date, except for

good cause shown.

Marion Cir. & Supe. Ct. Civ. R. LR49-TR3.1-201 ("Local Rule 49-Tr3.1-201"), http://www.in.gov/judiciary/files/marion-local-rules.pdf (last visited August 26, 2013). We have held that the good cause exception stated in the last sentence of this local rule applies when counsel has failed to timely file her written request with the court at least ten days prior to the trial date. *K.S. v. Marion Cnty. Dept. of Child Servs.*, 917 N.E.2d 158, 164 (Ind. Ct. App. 2009). However, the other requirements imposed on the requesting attorney must still be satisfied to comply with the local rule. *Id*.

In the instant matter, the first day of trial was held on June 22, 2012. On this day, the City conducted its examination of Aikman. Due to Aikman's failure or refusal to respond to the questions that were directed to him, Aikman was the only witness to testify on this date. At some point soon after the conclusion of the first day of trial, Aikman and his counsel suffered a breakdown of the attorney-client relationship.

On June 29, 2012, counsel filed a motion for leave to withdraw her appearance as counsel for Aikman. In this motion, counsel stated that there has been an "irretrievable breakdown" of the attorney-client relationship. Appellant's App. p. 74. Counsel included Aikman's last known address and indicated that Aikman was aware of her intent to withdraw.

On July 2, 2012, prior to the second day of trial, the trial court questioned counsel about her request to withdraw her appearance. With respect to the breakdown of the attorney-client relationship, counsel stated as follows:

> And, the problem is Mr. Aikman feels that I did not properly represent him [on the first day of trial] because I didn't put forth his evidence. And, I explained

7

> to him that the City had to put on their evidence first and then we would have our turn to get his side out and raise our defenses.
>
> At that point, I kept getting these crazy e-mails from Mr. Aikman and I just feel -- We tried to call him this morning. We also e-mailed him to get in touch with us if he wanted me, if there was any reason he wanted me to stay on the case, and I did not get an answer to the email[.]

July 2, 2012 Tr. pp. 4-5 (brackets added). Counsel also indicated that Aikman had failed to "sufficiently" pay her for her services. July 2, 2012 Tr. p. 5. For his part, Aikman stated that he believed counsel had been ineffective, claiming that counsel "just completely ignores me." July 2, 2012 Tr. p. 8. In permitting counsel to withdraw her appearance, the trial court indicated that it knew that counsel had not completely ignored Aikman. The trial court acknowledged the ten-day rule set forth in the local rules but found that, under the circumstances, "it seems appropriate to release [counsel] from representing Mr. Aikman." July 2, 2012 Tr. p. 5.

The record reveals that only ten days had passed between the first and second day of trial, and the irretrievable breakdown of the attorney-client relationship did not occur until the days following the first day of trial. Counsel notified Aikman of her intent to withdraw prior to filing her motion with the trial court. Upon filing her motion to withdraw, counsel informed the court of the breakdown of the attorney-client relationship and indicated that Aikman was aware of her intent to withdraw. Counsel also provided the trial court with Aikman's last known address as required by Local Rule 49-Tr3.1-201.

Again, the unexpected and untimely withdrawal of counsel does not necessarily entitle a party to a continuance. *Hess*, 679 N.E.2d at 154 (citing *Koors*, 530 N.E.2d at 783). Upon review of the denial of a request for a continuance, we consider whether the individual was a

8

fault, causing the need for the continuance; whether the individual's rights are likely to be prejudiced by the denial; whether the denial resulted in the deprivation of counsel at a crucial stage in the proceedings; and whether a delay would have prejudiced the opposing party. *Id*.

Here, based on the timing of the breakdown of the attorney-client relationship, it was impossible for counsel to comply with the ten-day rule set forth in Local Rule 49-Tr3.1-201. The record demonstrates that Aikman was largely, if not entirely, at fault for the need for the continuance. During the first day of trial, Aikman caused a delay in resolving the matter by failing or refusing to answer questions directed toward him. Aikman thereafter levied what appear to be unfounded allegations of ineffective assistance at his counsel despite counsel's attempt to explain the legal proceedings to Aikman and to assure Aikman that they would have the opportunity to present their defenses.[1] The record further demonstrates that the City would have been prejudiced by a continuance of the second day of trial as its witnesses, some of whom had appeared on numerous previous dates, were present and ready to testify.

Further, we cannot say that Aikman suffered prejudice as a result of the denial. While the denial resulted in Aikman having to represent himself on the second day of trial, the record indicates that the trial court, in which the instant matter was filed, is designed to and did proceed in a manner conducive to ensuring that *pro se* litigants like Aikman had the opportunity to "get a fair shake." July 2, 2012 Tr. p. 12. Aikman was given ample opportunity to challenge the remainder of the City's case. The record reflects that Aikman

---

[1] While not relevant to the determination as to whether the trial court abused its discretion in denying Aikman's request for a continuance, it must be noted that on the second day of trial, Aikman did not arrive until one hour after the proceedings were scheduled to begin despite being notified about what time the proceedings were scheduled to begin.

9

competently did so. Moreover, Aikman did not present his case until the third day of trial which was conducted on August 17, 2012. This delay of over one month gave Aikman the opportunity to obtain new counsel to represent him during the presentation of his case. Aikman, however, did not do so.

In light of these circumstances, we cannot say that the trial court abused its discretion in determining that there was good cause to allow counsel to withdraw her appearance without satisfying the 10-day requirement of Local Rule 49-Tr3.1-201. Likewise, we cannot say that the trial court abused its discretion in denying Aikman's request for a continuance of the second day of trial.

## II. Admission of Evidence

On appeal, Aikman contends that the trial court abused its discretion in admitting the evidence recovered during Officer Wolsiffer's search of his residence. Specifically, Aikman claims that the evidence recovered during the search of his residence should not have been admitted at trial because the search warrant, which authorized Officer Wolsiffer to search his residence, was not supported by probable cause. Aikman also claims that the evidence recovered during the search of his residence should not have been admitted at trial because Officer Wolsiffer's search exceeded the scope of the search warrant.

> Our standard of review for rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pre-trial motion to suppress or by an objection at trial. *Ackerman v. State*, 774 N.E.2d 970, 974-75 (Ind. Ct. App. 2002), *reh'g denied*, *trans. denied*. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. We also consider uncontroverted evidence in the defendant's favor. *Id*.

10

*Cole v. State*, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007). A trial court has broad discretion in ruling on the admissibility of evidence. *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003) (citing *Bradshaw v. State*, 759 N.E.2d 271, 273 (Ind. Ct. App. 2001)). Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id.* (citing *Bradshaw*, 759 N.E.2d at 273). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* (citing *Huffines v. State*, 739 N.E.2d 1093, 1095 (Ind. Ct. App. 2000)).

## A. Whether the Search Warrant was Supported by Probable Cause

Aikman argues that the evidence recovered during the search of his residence should not have been admitted at trial because the search warrant which authorized Officer Wolsiffer to search his residence was not supported by probable cause. "A search of a private house is presumptively unreasonable if conducted without a warrant." *Germaine v. State*, 718 N.E.2d 1125, 1129 (Ind. Ct. App. 1999), *trans. denied*.

> Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant. *Casady v. State*, 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010), *trans. denied* (citing *Mehring v. State*, 884 N.E.2d 371, 376 (Ind. Ct. App. 2008*), trans. denied*). Probable cause is a fluid concept incapable of precise definition and must be decided based on the facts of each case. *Id.*

*Smith v. State*, 982 N.E.2d 393, 404-05 (Ind. Ct. App. 2013), *trans. denied*.

As the purpose of the Fourth Amendment and Article I, Section 11 "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials, a

11

warrant is required during civil as well as criminal investigations unless some recognized exception to the warrant requirement applies." *Germaine*, 718 N.E.2d at 1129. However, "probable cause in the criminal sense is not required for administrative search warrants." *Sensient Flavors LLC v. Ind. Occupational Safety & Health Admin.*, 969 N.E.2d 1053, 1055 (Ind. Ct. App. 2012). Probable cause to conduct a nonconsensual inspection of a premise for administrative purposes can be established by presenting specific evidence of an existing violation or by showing compliance with reasonable legislative or administrative standards for inspecting the premises in question. *Id.*

> The duty of a reviewing court is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed. *State v. Spillers*, 847 N.E.2d 949, 953 (Ind. 2006). In this sense, a "reviewing court" includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision. *Id.* A "substantial basis" requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. *Id.* We review the trial court's substantial basis determination de novo, but we nonetheless afford significant deference to the magistrate's determination as we focus on whether reasonable inferences drawn from the totality of the evidence support that determination. *Id.* We consider only the evidence presented to the issuing magistrate, not after-the-fact justifications for the search. *Casady*, 934 N.E.2d at 1189.

*State v. Shipman*, 987 N.E.2d 1122, 1126 (Ind. Ct. App. 2013). Upon review, doubtful cases should be resolved in favor of upholding the warrant. *Id.*

Aikman challenges the sufficiency of the probable cause to support the warrant under both the Fourth Amendment and Article I, Section 11.

## 1. Fourth Amendment

The Fourth Amendment reads as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is made applicable to the states via the Due Process Clause of the Fourteenth Amendment. *W.H. v. State*, 928 N.E.2d 288, 294 (Ind. Ct. App. 2010) (citing *Mapp v. Ohio*, 367 U.S. 643, 656 (1961)). "Evidence obtained in violation of a defendant's Fourth Amendment rights may not be introduced against him at trial." *Id.* (citing *Mapp*, 367 U.S. at 648-60).

In the instant matter, on May 30, 2012, ACC filed an application for the issuance of an administrative search warrant for a home located at 1740 Dawson Street in Indianapolis. The application for the issuance of the search warrant read as follows:

Comes now [ACC], and applies to the Court for the issuance of an Administrative Search Warrant to enter the premises located at 1740 Dawson Street, Indianapolis … for the purpose of impounding animals that are being kept in violation of Chapter 531 of the Revised Code of the Consolidated City of Indianapolis and Marion County ("Revised Code"). In support thereof, [ACC] alleges and says the following:
1. Facts giving rise to a reasonable belief that animal(s) are located inside the structures on the Real Estate are in violation of said chapter 531 of the revised code are set forth in the affidavit of Kim Wolsiffer, attached hereto as Exhibit "A".
2. Pursuant to Section 531-712(d) of the Revised Code, [ACC] officers are not authorized to enter a privately owned enclosure in pursuit of an animal without the consent of the owner, lessee or other occupant of the enclosure, or other legal process.
3. Pursuant to Section 531-721 of the Revised Code, an animal found confined or abandoned on private property in violation of Chapter 531 of the Revised Code shall be impounded.
4. This Application is made for the sole purpose of exercising authority to inspect for current violations of Chapter 531 of the Revised Code and impound any animals that are being kept in violation of Chapter 531.

13

5.	[ACC] requests that the Sheriff of Marion County and/or the Indianapolis Metropolitan Police Department be ordered to provide the [ACC] officers with an escort onto and into the Real Estate for the purpose of preserving the peace and assisting in making forced entry, if necessary.

Appellant's App. p. 93. The affidavit of Officer Wolsiffer read, in relevant part, as follows:

4.	ON WEDNESDAY MAY 30, 2012, AT APPROX. 0750HRS, I, [ACC] OFFICER K WOLSIFFER, REPORTED TO 1740 DAWSON ST. IN REFERENCE TO A NEGLECT INVESTIGATION WITH A NOTE SUSPECTING THAT THIS RESIDENCE IS BEING USED AS A PUPPY MILL. UPON MY ARRIVAL, I OBSERVED A SINGLE STORY HOME WITH A COVERED FRONT PORCH. THE DRIVEWAY WAS ENCLOSED BY A SIX FOOT CHAIN LINK FENCE AND TWO GATES, ONE DOUBLE GATE FOR VEHICLE ACCESS, AND ONE WALK THROUGH GATE, WHICH HAD RED MATERIAL STRETCHED ACROSS IT AND PAINTED ON IT WERE THE WORDS, "NO ENTRY, NO TRESPASS, K-9 APPOINTMENT ONLY, K-9 NO ENTRY." THE WALK THROUGH GATE HAD A MAILBOX MOUNTED ON IT AND AFFIXED TO THE LID WAS A YELLOW DOOR NOTICE FROM [ACC] DATED 05/29/12, AT APPROX. 2030 HRS, ADVISING THE RESIDENT THAT MAKING CONTACT WITH [ACC] WAS NECESSARY.
5.	WHILE STANDING AT THE WALK THROUGH GATE I WAS ABLE TO SEE A BLACK STATION WAGON BEARING AN OUT OF STATE LICENSE PLATE AND A BROKEN REAR WINDSHIELD WITH BROKEN GLASS NEARBY. THE YARD TO THE RIGHT SIDE OF THE HOUSE WAS PARTIALLY ENCLOSED BY A HOME-MADE ENCLOSURE WHICH STOOD ABOUT FOUR FEET AND WAS COVERED IN A BLUE MATERIAL. INSIDE OF THIS ENCLOSURE WERE TALL GRASS, SOME OVERTURNED BUCKETS, AND DEBRIS. BEHIND THAT ENCLOSURE WAS A TALLER FENCE, ALSO COVERED IN RED MATERIAL LIKE THE DRIVEWAY GATES. ON THE FRONT PORCH SAT A LARGE MOTORCYCLE THAT APPEARED TO BE BLACK AND GRAY IN COLOR WITH A LARGE CLEAR BUG SHIELD.
6.	THERE WAS NO WAY FOR THIS OFFICER TO ENTER THE PORCH OR GET TO THE FRONT DOOR, HOWEVER, I WAS ABLE TO POSITION MYSELF CLOSE ENOUGH TO THE RIGHT SIDE OF THE PORCH WALL TO REACH A NEARBY WINDOW TO KNOCK ON. NO ONE REPORTED TO THE FRONT DOOR BUT I DID BEGIN TO HEAR SEVERAL DOGS BARKING INSIDE OF THE HOME. BY THIS TIME THERE WERE SEVERAL NEIGHBORS THAT HAD REPORTED TO

14

THEIR RESPECTIVE FRONT PORCHES. A MALE NEIGHBOR TO THE LEFT OF 1740 WAS STANDING ON HIS PORCH WITH TWO YOUNG GIRLS. THIS INDIVIDUAL INVITED ME TO WALK IN HIS OPEN SIDE YARD SO THAT I COULD VIEW ALONG THE DRIVEWAY SIDE OF 1740. AS I NEARED THE REAR OF THE RESIDENCE, THE FENCING STOOD APPROX. 5FT 4IN TALL AND I COULD SEE THAT THERE WAS A SECOND GATE SEPARATING THE DRIVEWAY FROM THE BACKYARD. I WAS ABLE TO OBSERVE A GREAT DEAL OF DEBRIS ALONG WITH A RED LATE MODEL FORD MUSTANG WITH BLACK RACING STRIPES AND BLACK ROOF. THERE WERE SEVERAL VARIOUS ITEMS BEING USED TO SECURE OPEN ACCESS BETWEEN FENCE AND GROUND. THE ITEMS INCLUDED AN OCTAGONAL WINDOW WITH CASING, WOOD, CARDBOARD, PLASTIC SCREENS THAT HAD BEEN REMOVED FROM BOX FANS, ETC. AT THIS TIME, A SKINNY WHITE MALE WITH GRAY FACIAL HAIR, WEARING A DARK GRAY OR BLACK FADED TSHIRT, EXITED THROUGH A BACK DOOR THAT HAD WOOD PLANKS MOUNTED ON IT. UPON HIS EXIT, HE WAS ACCOMPANIED BY SEVERAL SMALL WHITE MALTESE LOOKING DOGS, NUMBER UNKNOWN. THE INDIVIDUAL ADVISED ME TO MEET HIM AT THE FRONT GATE SO THAT WE COULD SPEAK. I DID AS REQUESTED, AS THIS SAME INDIVIDUAL EXITED THE FRONT DOOR; I ASKED HIM HOW MANY DOGS HE HAD. HE STATED THAT HE HAD TOO MANY TO HANDLE BUT THAT HE DID NOT HAVE A CHOICE BECAUSE HE WAS NOW NURSING ALL 33 OF THE DOGS BACK TO HEALTH AFTER ANIMAL CONTROL GAVE THEM ALL BACK TO HIM SICK. I ASKED HIM WHAT HE MEANT BY THAT AND HE STATED THAT ALL OF THE DOGS WERE NOW SICK WITH KENNEL COUGH AFTER HAVING BEEN AT THE POUND. HE WENT ON TO STATE THAT NOW HE HAD PNEUMONIA AS A RESULT OF THE DOG'S KENNEL COUGH. WHEN I ASKED HIM TO CLARIFY HE STATED THAT HE REALLY DIDN'T KNOW HOW HE CONTRACTED PNEUMONIA BUT HE HAD IT.

7. THIS INDIVIDUAL, LATER IDENTIFIED AS JOHN AIKMAN, BEGAN TO SHOW SIGNS OF AGITATION AND HAD BEGUN TO RAISE HIS VOICE. I EXPLAINED TO THIS INDIVIDUAL THAT ALL I NEEDED FROM HIM WAS EVIDENCE OF PROPER CARE AND TREATMENT OF THE ANIMALS THAT HE HAS POSSESSION OF DUE TO THE FACT THAT THERE HAD BEEN [A] COMPLAINT CALLED INTO [ACC]. I CONTINUED BY SAYING THAT SINCE THE ANIMALS ARE KEPT INSIDE, I WOULD NEED HIM TO ESCORT ME INSIDE OF THE HOME SO THAT I COULD OBSERVE EVIDENCE OF PROPER CARE. HE STATED THAT I WOULD NOT BE COMING

INSIDE OF HIS HOME UNTIL HE WAS AWAKE. I QUESTIONED WHAT HE MEANT BY THAT BECAUSE HE WAS STANDING BEFORE ME AND HAD BEEN SPEAKING WITH ME. HE ATTEMPTED TO CORRECT HIMSELF BY SAYING THAT HIS WIFE WAS STILL ASLEEP AND THAT I NEEDED TO WAIT 15 MINUTES, MAYBE ONE HALF HOUR BEFORE COMING INSIDE OF HIS HOME. I ADVISED THIS INDIVIDUAL THAT IN THIS PARTICULAR INSTANCE I WOULD NOT BE WORKING OFF OF HIS SCHEDULE AND IF NECESSARY I WOULD PROCEED WITH A WARRANT REQUEST FOR [ACC] TO ENTER HIS HOME IN THAT MANNER. HE STATED THAT THAT WAS WHAT I WOULD HAVE TO DO. I ACKNOWLEDGED BY SAYING, "OKAY" AND BEGAN TO RETURN TO MY [ACC] VEHICLE. THE MAN AGAIN STATED THAT IF I WOULD JUST WAIT 15 OR 20 MINUTES THAT HE WOULD WAKE UP AND HIS WIFE WOULD GET UP BUT WE, [ACC], WEREN'T GOING TO TAKE HIS DOGS AND MAKE THEM SICK AGAIN. I ADVISED THIS INDIVIDUAL THAT I WOULD BE REQUESTING A WARRANT FOR [ACC] TO GAIN ACCESS TO HIS PROPERTY AS IT RELATED TO THE CARE AND TREATMENT OF ANY AND ALL ANIMALS ON THIS PROPERTY.

8. AT THAT TIME, I ENTERED MY VEHICLE AND LEFT THE SCENE TO RETURN TO [ACC] TO SHARE THIS INCIDENT WITH SGT PAYNE, UNIT 8808, REQUEST A WARRANT FOR THIS ADDRESS, AND SUBMIT THIS REPORT.

9. UPON MY RETURN TO [ACC], I WAS ADVISED BY DEPUTY CHIEF BROWN THAT MR. AIKMAN HAD CALLED HE AND REQUESTED THAT I RETURN TO HIS PROPERTY FOR INSPECTION. HE HAD AGREED WITH DEPUTY CHIEF BROWN TO LET ME INSPECT THE INSIDE OF HIS HOME WHERE HE IS KEEPING HIS DOGS.

10. I THEN RELOCATED BACK TO 1740 DAWSON STREET; UPON MY ARRIVAL I MADE CONTACT WITH MR. AIKMAN. MR. AIKMAN INVITED ME INTO THE BACKYARD OF THE RESIDENCE. I THEN ASKED HIM TO LET THE DOGS OUT OF THE RESIDENCE FOR ME TO VIEW THE DOGS AND THEN INSPECT THE RESIDENCE WITHOUT THE LARGE NUMBER OF DOGS PRESENT. MR. AIKMAN LET THE DOGS OUT OF THE RESIDENCE AT WHICH POINT, NUMEROUS DOGS EXITED AND BEGAN TO BITE AT MY LEGS AND ANKLES. I WAS ABLE TO THEN RETREAT FROM THE BACKYARD WITHOUT INJURY.

11. ONCE I RELOCATED TO THE DRIVEWAY, MR. AIKMAN THEN TOLD ME THAT I WAS NO LONGER WELCOME TO INSPECT THE INSIDE OF THE RESIDENCE. AT WHICH POINT, I ATTEMPTED

16

TO LEAVE THE PROPERTY. MR. AIKMAN AGAIN CALLED ME BACK AND SAID I COULD NOW INSPECT, DUE TO THE BACK AND FORTH NATURE OF HIS CONSENT I REQUESTED A SUPERVISOR TO THE SCENE. MR. AIKMAN THEN, AGAIN STATED "I LOST MY CHANCE" AND COULD NO LONGER INSPECT.

12. BASED UPON THE COMPLAINT AND MY INVESTIGATION, I BELIEVE THAT THE VIOLATIONS OF THE PROVISIONS OF SECTION 531-401, OF THE [REVISED CODE] ARE ONGOING AT THE PREMISES AND REQUEST ACCESS INSIDE THE RESIDENCE FOR INSPECTION AND POSSIBLE IMPOUNDMENT OF ANIMALS BEING KEPT IN VIOLATION OF THE [REVISED CODE].

Appellant's App. pp. 95-98.

Based upon the information presented in the application and Officer Wolsiffer's affidavit, we can say that it was reasonable for Officer Wolsiffer to believe that violations of the Revised Code were occurring inside Aikman's residence. Officer Wolsiffer's initial observations of the property coupled with Aikman's initial denial to allow Officer Wolsiffer to search his property and the "back and forth nature" of his subsequent willingness to allow Office Wolsiffer to search his residence support the reasonable inference that Aikman was committing violations of Chapter 531 of the Revised Code. In addition, the documents also tend to show compliance with reasonable standards adopted by ACC for inspecting a residence. Therefore, we conclude that a reasonably prudent person could make a practical, common-sense determination, given all the circumstances set forth in the application and Officer Wolsiffer's affidavit, that there was a fair probability that Aikman was committing violations of Chapter 531 of the Revised Code inside the residence.

### 2. Article I, Section 11

Article I, Section 11 reads as follows:

> **Unreasonable search or seizure; warrant.** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

The legality of a governmental intrusion under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Trotter v. State*, 933 N.E.2d 572, 580 (Ind. Ct. App. 2010) (citing *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005)). "Although there may be other relevant considerations under the circumstances, the reasonableness of a search or seizure turns on a balancing of the following: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement needs." *Id*. (citing *Litchfield*, 824 N.E.2d at 361). The burden is on the State to show that under the totality of the circumstances, the police intrusion was reasonable. *Id*. (citing *State v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002)).

Here, ACC's degree of concern, suspicion, or knowledge that a violation of the Revised Code had occurred was high. ACC had received a complaint alleging that Aikman was neglecting animals in his care and operating a "puppy mill" in violation of Chapter 531 of the Revised Code. The needs of ACC were great, as the search was necessary to make sure that many animals were not being mistreated or neglected. Further, while the scope of the requested warrant did reflect an intrusion into Aikman's ordinary activities, such an intrusion was not unwarranted in light of the degree of ACC's suspicion and knowledge that

18

violations were occurring and the resulting needs of ACC to investigate the alleged violations of Chapter 531 of the Revised Code. In light of these circumstances, we conclude that the search of Aikman's residence was reasonable.

The application filed by ACC together with Officer Wolsiffer's affidavit were sufficient to establish probable cause that Aikman was committing violations of Chapter 531 of the Revised Code in his residence. These documents satisfy the constitutional requirements of the Fourth Amendment and Article I, Section 11. Accordingly, we reject Aikman's claims in this regard.

**B. Whether Officer Wolsiffer's Search Exceeded the Scope of the Search Warrant**

Aikman also claims that the evidence recovered during Officer Wolsiffer's search of his residence should not have been admitted during trial because Officer Wolsiffer's search exceeded the scope of the search warrant. Specifically, Aikman claims that Officer Wolsiffer exceeded the scope of the search warrant because the search only permitted ACC to enter onto his property, not to enter his residence. We cannot agree.

The order issued by the trial court granting ACC's request for an administrative search warrant in the instant matter reads, in relevant part, as follows:

> WHEREAS, a proper Application for Administrative Search Warrant has been submitted to this Court, a copy of which is *attached hereto and incorporated herein*, and whereas this Court has examined said application and is duly advised in the premises, the Court now finds that there is a reasonable basis for the issuance of this Administrative Search Warrant.
> THEREFORE, YOU ARE HEARBY ORDERED to permit the Chief of the [ACC], by his/her designee, to enter onto the real estate commonly known as 1740 Dawson Street, Indianapolis, Indiana, for the purpose [of] impounding any and all dead or alive animals, that are being kept in violation of the provisions of Chapter 531 of the Revised Code….

Appellant's App. p. 94 (emphasis and brackets added).

As is shown above, ACC's application for the administrative search warrant expressly requested permission to "enter the premises located at 1740 Dawson Street … for the purpose of impounding animals that are being kept in violation of Chapter 531 of the Revised Code." Appellant's App. p. 93. This clear language leaves no doubt that ACC sought permission to enter Aikman's residence. Because the documents, when read together, clearly demonstrate that the search warrant authorized ACC to enter Aikman's residence in order to determine whether Aikman was violating Chapter 531 of the Revised Code, we conclude that the trial court's order included the authorization for Officer Wolsiffer to enter Aikman's residence. Upon entering the residence, Officer Wolsiffer found fifty-one dogs and puppies and observed numerous violations of Chapter 531 of the Revised Code. Nothing in the record suggests that Officer Wolsiffer's search exceeded the scope of the search warrant.

Furthermore, "real estate" or "real property" may be defined as "Land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." BLACK'S LAW DICTIONARY 1254 (8th ed. 2004). The trial court's order granted [ACC] to enter "the real estate … for the purpose [of] impounding any and all dead or alive animals" that were being kept on the property. Appellant's App. p. 94. We conclude that this includes entering the residence erected on the real estate.

Having concluded that the search warrant was supported by probable cause and that the search did not exceed the scope of the search warrant, we further conclude that the trial court did not abuse its discretion in admitting the evidence recovered during the search of

Aikman's residence.

## C. Fundamental Error

Alternatively, Aikman argues that his failure to challenge the legality of the search

warrant by requesting suppression of the evidence at trial amounted to fundamental error.

> [T]o qualify as fundamental error, "an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Mitchell v. State*, 726 N.E.2d 1228, 1236 (Ind. 2000) (citations omitted). To constitute fundamental error, "the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Id.* (citations omitted).

*Brown v. State*, 799 N.E.2d 1064, 1067 (Ind. 2003) (footnote omitted).

Upon review, the record demonstrates that Aikman challenged the legality of the

search warrant and the admission of the evidence recovered during the search of his

residence on at the conclusion of his presentation of evidence. The City argued that such a

challenge was untimely as the evidence recovered during the search had already been

admitted into the record. However, we need not decide whether Aikman's challenge should

be considered to be a timely challenge to the admission of the evidence in light of our

conclusions that the search warrant was supported by probable cause and that the search of

Aikman's residence did not exceed the scope of the search warrant. In making these

conclusions, we also concluded that the evidence recovered during the search of Aikman's

residence was admissible at trial. Because the evidence was admissible at trial, Aikman

cannot prove that any alleged failure to challenge the admissibility of the evidence amounted

to error, much less fundamental error.

## III. Sufficiency of the Evidence

21

Aikman contends that the evidence is insufficient to sustain the judgment of the trial court. Specifically, Aikman claims that the evidence is insufficient to prove that he violated Chapter 531 of the Revised Code. Aikman also claims that the evidence is insufficient to sustain the trial court's order permanently enjoining him from owning or caring for animals in Marion County.

A violation of a county ordinance must be proved by a preponderance of the evidence. Ind. Code § 34-28-5-1(e). A determination that an individual has committed violations of the Revised Code is a general judgment, and we will review it as such. At the conclusion of the hearing, the trial court explained its decision in a manner that constitutes findings of fact.

> Where a trial court enters findings of fact and conclusions of law sua sponte and without being required to do so by rule, specific findings control only as to issues they cover, and a general judgment standard applies to any issues upon which the trial court has not made findings. *Perdue v. Murphy*, 915 N.E.2d 498 (Ind. Ct. App. 2009). When reviewing findings, we determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will reverse such a judgment only when it is shown to be clearly erroneous, i.e., when it is unsupported by the findings of fact and conclusions thereon, *id*, or when the trial court applies the wrong legal standard. *Fraley v. Minger*, 829 N.E.2d 476 (Ind. 2005). We defer substantially to the trial court's findings of fact, but we evaluate conclusions of law de novo. *Id.*

*Jewell v. City of Indpls.*, 950 N.E.2d 773, 776-77 (Ind. Ct. App. 2011). Upon review, we neither reweigh the evidence or the credibility of the witnesses. *Martin v. Roberts*, 464 N.E.2d 896, 904 (Ind. 1984). Instead, we consider the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Id.*

### A. Whether the Evidence Is Sufficient to Sustain the Trial Court's Determination that Aikman Committed Several Violations of Chapter 531 of the Revised Code

In arguing that the evidence is insufficient to prove that he violated Chapter 531 of the Revised Code, Aikman claims that the evidence is insufficient to prove that he: (1) failed to provide proper identification for the animals in his care, (2) failed to vaccinate or provide rabies tags for the animals in his care, (3) mistreated his animals by giving them a home remedy for kennel cough, and (4) kept the dogs in unclean conditions.

## 1. Proper Identification

Revised Code section 531-202 provides that a person who owns a dog in Marion County "shall ensure that each dog … owned by that person bears a permanent means of identification at all times." The means of identification required by this section shall be in addition to any tags required to be worn by the dogs by state law, and shall be either by means of a microchip implanted in the dog which bears a registered identification number or a permanent tag attached to a durable collar worn at all times by the dog. Revised Code § 531-202. This section provides that it shall be a violation of the Revised Code for a person to own a dog "three (3) months of age or older which is kept in the consolidated city and county, and which does not bear a permanent means of identification." Revised Code § 531-202. Any violation of this section shall be subject to a civil penalty as described in Chapter 103 of the Revised Code. Revised Code § 531-202.

On appeal, Aikman claims that the evidence is insufficient to "support the trial court's guilty verdicts" under Revised Code section 531-202. In making this claim, Aikman only presents an argument relating to the trial court's determination that he committed twenty-six violations of this section on May 11, 2012. As such, we will limit our review of the evidence

23

to the trial court's determination relating to May 11, 2012.

In arguing that the evidence is insufficient to sustain the trial court's determination that Aikman committed twenty-six violations of Revised Code section 531-202, Aikman argues that Sargent Kindig of ACC did not testify how many of the thirty-three dogs impounded were scanned for microchips. The record, however, reveals that Sargent Kindig testified that thirty-three animals were impounded on May 11, 2012, none of which were wearing identification tags or had microchips. Aikman also argues that some of the thirty-three dogs impounded on May 11, 2012, were puppies that were not yet required to bear permanent identification. Sargent Kindig testified that of the thirty-three animals that were impounded on May 11, 2012, seven were young puppies. Therefore, even assuming that these seven puppies were below the age of three months, there were still twenty-six dogs impounded, none of which bore the proper identification required by Revised Code section 531-202. As such, we conclude that the evidence is sufficient to prove by a preponderance of the evidence that, with respect to May 11, 2012, Aikman committed twenty-six violations of Revised Code section 531-202.

## 2. Rabies Vaccination

Revised Code section 531-301 provides that it shall be unlawful "to keep a dog … over the age of three (3) months in the city unless each … dog is immunized against rabies. Revised Code section 531-301 provides that each dog must bear a tag affixed to its collar indicating that it has received the required rabies vaccination. Any violation of these sections shall be subject to a civil penalty as described in Chapter 103 of the Revised Code. Revised

24

Code §§ 531-301, -302.

In claiming that the evidence is insufficient to prove that he violated Revised Code sections 531-301 and -302, Aikman argues that "[a]t no time did the City establish how many dogs and puppies exceeded three months of age." Appellant's Br. p. 50. Again, we disagree.

With respect to the violations found to have occurred on May 11, 2012, the record demonstrates that thirty-three dogs were impounded by ACC. Of these thirty-three dogs, seven were young puppies. Of the remaining twenty-six dogs, the trial court determined that Aikman possessed records indicating that fifteen dogs had received the required rabies vaccinations, leaving eleven dogs that had not received the required vaccinations. The evidence also demonstrates that none of the twenty-six dogs were wearing the required tags indicating that they had received the required rabies vaccinations. The evidence is sufficient to prove by a preponderance of the evidence that on this date, Aikman committed eleven violations of Revised Code section 531-301 and twenty-six violations of Revised Code section 531-302.

With respect to the violations found to have occurred on May 30, 2012, the citations issued by Officer Wolsiffer indicate that upon impounding fifty-one dogs and puppies, Officer Wolsiffer determined that twenty-nine dogs lacked the required rabies vaccinations and tags. It is reasonable to assume from the citations alleging twenty-nine violations that only twenty-nine of the fifty-one dogs were over the age of three months, the age when it becomes necessary to vaccinate a dog under Revised Code section 531-301.

We note that twenty-six of the twenty-nine dogs appear to be the same dogs at issue

25

on May 11, 2012. Again, the trial court determined that Aikman provided adequate records to prove that fifteen of these dogs had received the required rabies vaccinations. Of the remaining fourteen dogs, nothing in the record suggests that the eleven of these dogs that were found to be lacking the required rabies vaccinations on May 11, 2012, had received the required vaccinations at any time after May 11, 2012. Nothing in the record indicates that any of the twenty-six dogs that were found to be without the required tags on May 11, 2012, were wearing the required tags on May 30, 2012. In addition, nothing in the record suggests that the additional three dogs at issue on May 30, 2012, had received the required rabies vaccinations or were wearing the required rabies tags.

In light of the reasonable inference that twenty-nine of the fifty-one dogs and puppies impounded on May 30, 2012, were of the age requiring vaccination, coupled with the evidence that Aikman could only provide documentation demonstrating that fifteen of the dogs had received the required vaccinations and none of the twenty-nine dogs were wearing the required rabies tags, we conclude that the evidence is sufficient to prove by a preponderance of the evidence that on this date, Aikman committed fourteen violations of Revised Code section 531-301 and twenty-nine violations of Revised Code section 531-302.

### 3. Mistreatment of the Animals

In claiming that the evidence is insufficient to sustain the trial court's determination that he mistreated his animals, Aikman argues that Jodie Schermerhorn, the City's witness who testified that the home remedy for kennel cough given to the dogs by Aikman was dangerous, was not credible. Specifically, Aikman argues that despite Schermerhorn's nine

26

years of experience working with animals, her testimony was not credible because she was not a registered veterinary technician.

Indiana Evidence Rule 702 provides that if "specialized knowledge will assist the trier of fact to … determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

> [W]here an expert's testimony is based upon the expert's skill or experience rather than on the application of scientific principles, the proponent of the testimony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and the witness possesses sufficient skill, knowledge or experience in the field to assist the trier of fact to understand the evidence or to determine a fact in issue. Evid. R. 702(a); *Corbin v. State*, 563 N.E.2d 86, 92-93 (Ind. 1990).

*Lytle v. Ford Motor Co.*, 696 N.E.2d 465, 469-70 (Ind. Ct. App. 1998). The determination of the admissibility of expert testimony is a matter within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. *Id*. at 470.

Here, the record demonstrates that Schemerhorn was employed as executive director of the Spot Spay Neuter Clinic where at least some of Aikman's dogs and puppies were seen after being impounded. Schemerhorn testified that she had nine years of experience working as a veterinary technician and had received on-the-job training for her employment. Schemerhorn demonstrated that she was familiar with the condition of the dogs when they arrived at the Spot Spay Neuter Clinic, familiar with the common treatment for a condition known as "kennel cough," and familiar with whether certain substances could be dangerous to dogs. The City demonstrated that the subject matter on which Schemerhorn would testify

27

was related to Schemerhorn's knowledge about the above-stated matters, and the trial court determined that Schemerhorn possessed sufficient skill, knowledge, or experience in this field to assist the court in determining a fact in issue. We agree.

Having determined that the trial court did not abuse its discretion in admitting Schermerhorn's testimony, we reiterate again that upon review, we will not reweigh the credibility of witnesses but rather will consider the evidence most favorable to the judgment. *See Martin*, 464 N.E.2d at 904. The evidence most favorable to the judgment of the trial court indicates that Aikman gave, at least some of, his dogs a home remedy for kennel cough that consisted of lemon and lime juice, honey, hydrogen peroxide, and water. Schermerhorn testified that in approximately nine years, she has only administered hydrogen peroxide to a dog on one occasion and that in that case, the hydrogen peroxide was used to induce vomiting. Schermerhorn stated that she has never known hydrogen peroxide to be used for treating a dog with kennel cough. Schermerhorn also testified that lemon and lime juice are both "very dangerous to animals." July 2, 2012 Tr. p. 114. Schermerhorn further stated that giving these materials to a dog could potentially cause "very serious reactions[.]" July 2, 2012 Tr. p. 114. Schermerhorn's testimony is sufficient to prove by a preponderance of the evidence that Aikman mistreated his dogs by giving the dogs a home remedy for kennel cough that included hydrogen peroxide and lemon and lime juices.

### 4. Unclean Conditions

Revised Code section 531-401(a)(1) provides that every owner or keeper of an animal shall see that such animal:

28

Is kept in a clean, sanitary and healthy manner is not confined so as to be forced to stand, sit or lie in its own excrement; the person(s) responsible for animal(s) shall regularly and as often as necessary to prevent odor or health and sanitation problems, maintain all animal areas or areas of animal contact.

Any violation of this section shall be subject to a civil penalty as described in Chapter 103 of the Revised Code. Revised Code § 531-401.

In arguing that the evidence is insufficient to sustain the trial court's determination that he committed fifty-one violations of Revised Code section 531-401, Aikman states that "[w]hile the trial court found that the dogs and puppies were not 'kept in a clean, sanitary and healthy manner', no finding was made that the animals were forced to stand, sit or lie in their own excrement." Appellant's Br. p. 53. Aikman, acknowledges, however, that in making this determination, the trial court found that he failed to maintain the dogs or the areas that the dogs came into contact with so as to prevent odor or health and sanitation problems.

The trial court found that Aikman committed fifty-one violations of Revised Code section 531-401 on May 30, 2012. Officer Wolsiffer testified that on this date, she inspected Aikman's residence and determined that it was not suitable for the dogs. During her inspection of the residence, Officer Wolsiffer noticed that the conditions of the home were poor. There was a considerable amount of trash and debris, including an abandoned vehicle, in the backyard of the property where the dogs played. There was a "strong odor" of urine inside the residence, as well as urine and feces stains on the floor or floor coverings. The residence contained a lot of clutter and there were swarms of flies in the kitchen.

Officer Wolsiffer observed several "smaller" dogs playing in a room that contained yard tools, such as a weed eater and a chainsaw. July 2, 2012 p. Tr. 80. There were also

29

urine and feces stains "all over the carpet" in this room. July 2, 2012 p. Tr. 81. In the basement, Officer Wolsiffer noticed a strong smell of urine and observed "piles of feces" and "puddles of urine." July 2, 2012 p. Tr. 82. Officer Wolsiffer noted that there was insufficient food and water for the dogs kept in the basement. The basement was also musty and damp.

Upon review, we conclude that Officer Wolsiffer's testimony is sufficient to prove beyond a preponderance of the evidence that Aikman committed fifty-one violations of Revised Code section 531-401 because Aikman failed to keep a clean, sanitary, and healthy residence that was sufficient to prevent odor or health and sanitation problems.

### B. Whether the Evidence Is Sufficient to Sustain the Trial Court's Order Permanently Enjoining Aikman from Owning/Caring for Animals in Marion County

Chapter 103, section 3 of the Revised Code provides that if a person has been found to have violated the Revised Code, the City is authorized to impose fines and/or seek an injunction to abate a further violation. Aikman claims, however, that the evidence was insufficient to sustain the trial court's order permanently enjoining him from owning or caring for animals in Marion County because there was no evidence that he would continue violating Chapter 531 of the Revised Code. We disagree.

The record demonstrates that ACC impounded thirty-three dogs from Aikman on May 11, 2012. At this time, ACC alleged that Aikman had committed numerous violations of Chapter 531 of the Revised Code. The dogs were released to Aikman on May 22, 2012. Soon thereafter, on May 30, 2012, ACC impounded fifty-one dogs and puppies, some of

30

which were the same dogs impounded on May 11, 2012, from Aikman. At this time, ACC alleged that Aikman was continuing to commit some of the original violations and had committed numerous other violations of Chapter 531 of the Revised Code.

The fact that Aikman had not corrected all prior violations and had committed new violations in the few days after the dogs were released to him by ACC supports the trial court's determination that Aikman would commit both future and ongoing violations of Chapter 531 of the Revised Code. As such, we conclude that the evidence presented at trial is sufficient to sustain the trial court's order permanently enjoining Aikman from owning or caring for animals in Marion County.

### IV. Order Enjoining Aikman from Owning/Caring for Animals

Aikman last contends that he did not receive proper notification that the City intended to seek an injunction that would permanently prohibit him from owing or caring for animals in Marion County. Aikman concedes, however, that the petition for an order of impoundment filed by the City clearly indicated that the City sought such an injunction. Aikman presents no argument indicating that he did not receive a copy of the City's petition or indicating what additional notice of the City's intention to seek the injunction that he believed he was entitled to receive. Aikman merely states that both he and his wife loved the dogs and took great pleasure in caring for the animals. While we do not doubt that Aikman and his wife took great pleasure in caring for the dogs and that they loved the animals that were in their care, Aikman has failed to demonstrate that he did not receive proper

31

notification of the City's intention to seek the above-described injunction.[2]

The judgment of the trial court is affirmed.

BAILEY, J., and MAY, J., concur.

---

[2] Furthermore, to the extent that Aikman argues that the trial court erred in issuing the order permanently enjoining him from owning or caring for animals in Marion County because the evidence was insufficient to prove that he committed the violations alleged by ACC, we disagree in light of our above-stated conclusion that the evidence was sufficient to sustain the trial court's determination that Aikman committed the challenged violations of Chapter 531 of the Revised Code.